06-1728(L), 06-1808 - pr
Wright v. Goord

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2007

(Argued: April 23, 2008          Decided: February 3, 2009)

Docket Nos. 06-1728(L), 06-1808 - pr

_____

MELVIN M. WRIGHT, JR., as Administrator of the
Affairs of Melvin O. Wright, deceased,

Plaintiff-Appellant,

- v. -

GLENN S. GOORD, Commissioner; A. DIRE, Corrections
Officer, Coxsackie Correctional Facility; M. DERMUTT,
Corrections Officer, Coxsackie Correctional Facility;
M. KASUNIC, Corrections Officer, Coxsackie
Correctional Facility; GARY H. FILION, Superintendent
of Coxsackie Correctional Facility; TIBERIS,
Corrections Officer, Coxsackie Correctional
Facility; ZIMBER, Corrections Officer, Coxsackie
Correctional Facility; and A. MORRIS, Corrections
Officer, Coxsackie Correctional Facility,

Defendants-Appellees,

NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES,
NEW YORK STATE, and DAVID A. PATERSON,[*] Governor of
New York State in his official capacity,

Defendants.

_____

Before:  JACOBS, Chief Judge, KEARSE and KATZMANN, Circuit Judges.

_____

[*]     Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
        Governor David A. Paterson is automatically substituted
        for former Governor George E. Pataki as a defendant in
        this case.

Consolidated appeals from judgments of the United States District Court for the Northern District of New York, summarily dismissing claims under 42 U.S.C. § 1983 against New York State Department of Corrections officers for alleged violations of the First and Eighth Amendments.

Affirmed.

CAROLYN A. KUBITSCHEK, New York, New York (Darius Charney, Lansner & Kubitschek, New York, New York, Efaon Cobb, law student intern, Daniil Karp, student intern, on the brief), for Plaintiff-Appellant.

MARTIN A. HOTVET, Assistant Solicitor General of the State of New York, Albany, New York (Andrew M. Cuomo, Attorney General, Barbara D. Underwood, Solicitor General, Andrea Oser, Deputy Solicitor General, Albany, New York, on the brief), for Defendants-Appellees.

KEARSE, Circuit Judge:

In these consolidated appeals, plaintiff Melvin M. Wright, Jr., as administrator of the affairs of Melvin O. Wright ("Wright"), who was an inmate in the custody of the New York State Department of Correctional Services ("DOCS") from 1982 until November 2007, a month before his death, pursues challenges to summary judgments entered in two actions in the United States District Court for the Northern District of New York dismissing Wright's claims, brought pursuant to 42 U.S.C. § 1983, against several DOCS corrections officers ("COs") for alleged use of excessive force in violation of the Eighth Amendment and retaliation in violation of the First Amendment. On appeal,

- 2 -

plaintiff contends that summary judgment was inappropriate because there were genuine issues of material fact to be tried with respect to these claims. For the reasons that follow, we find no error and affirm the judgments.

## I. BACKGROUND

The present appeals arise out of two actions brought by Wright, then proceeding pro se, to complain of a series of events that occurred in 2003 at New York State's Coxsackie Correctional Facility ("Coxsackie"), where Wright had been incarcerated since August 2002. The issues on appeal have been limited (see Part I.E. below) by a prior order of this Court dismissing Wright's appeal with respect to certain of his claims and allowing him to proceed--and appointing counsel to represent him--on his "claim that the defendants violated his Eighth Amendment rights when he was assaulted and intimidated by correctional officers at Coxsackie Correctional Facility" and other undismissed claims. Wright v. Goord, No. 06-1808 (2d Cir. Sept. 22, 2006).

A. The First Action ("Action I")

Wright first commenced an action in June 2003 against DOCS and several individual defendants. His second amended complaint in that action ("second amended complaint" or "Action I Second Amended Complaint") named as individual defendants DOCS Superintendent Glenn S. Goord, Coxsackie Superintendent Gary H.

Filion, and Coxsackie COs Tiberis, Zimber, and Morris, and described incidents occurring in February and April 2003 in which Wright asserted that his constitutional rights had been violated.

The first incident, according to the second amended complaint, occurred on or about February 6. Wright, an African-American housed in a DOCS regional medical ward annexed to Coxsackie, was assaulted by his then-cellmate Robert Brandel with the latter's walking cane. Brandel, who Wright alleged was Caucasian, then summoned "security" and accused Wright of both assaulting him and calling him a "Cracker." (Action I Second Amended Complaint ¶¶ 6-8.) "[S]ecurity" took Brandel's cane and moved Wright to another cell, making comments to Wright about his not liking "crackers." (Id. ¶¶ 7-8.) No disciplinary action was taken against either inmate. (Deposition of Melvin O. Wright ("Wright Dep.") 13.) Wright did not know the names of the COs to whom he referred as security. (Id. at 17-18.)

The second amended complaint alleged that on February 26, the COs, upon learning that Brandel had committed the assault, gave the cane back to him. The pleading suggested that the return of the cane to Brandel in these circumstances, with the COs believing that Wright disliked "crackers," constituted a threat against Wright by the COs themselves:

> [w]hen, security learned that inmate Brandel, was the person that committed the assault against [Wright], February 26, 2003; security gave Brandel, back his walking cane. After taken the cane from him that night of February 6, 2003; stating: "You don't like crackers?"

. . . .

- 4 -

> 10. Especially, after the willful attempt and threats to inflict injury upon [Wright], and coupled with an apparent present ability so to do from corrections officers; and any intentional display of force such as was shown that night of February 26, 2003. Was enough for [Wright] to have reason to fear or expect immediate physical harm or assault by the officers; therefore, also a grievance was filed.

(Action I Second Amended Complaint ¶¶ 8, 10.) On February 27, Wright wrote a letter to the county district attorney, with a copy to Superintendent Filion, complaining about these events. Wright never received a response to this letter (see id. ¶ 9), the text of which is set out in Part II.B.2. below.

The second incident of which Wright complained in Action I occurred on or about April 2, 2003. While Wright was in his cell working on legal papers, another inmate, George Cavallo, brought newspapers to Wright's cell. (See id. ¶ 11.) CO Morris observed this and ordered Wright to get rid of the papers. Wright responded that he was not going to get rid of his legal papers, and he then took the newspapers to Cavallo's cell. (See Wright Dep. 18-19.) Morris promptly issued a misbehavior ticket to Wright charging him with (1) refusing a direct order, (2) being out of place, (3) engaging in unauthorized exchange of personal property, and (4) possessing an authorized item in an unauthorized area. (See Inmate Misbehavior Report, dated April 2, 2003.) With respect to the same incident, Morris also issued a misbehavior report against Wright on April 9, 2003. (See Action I Second Amended Complaint ¶ 13.) Wright filed grievances complaining of Morris's actions. He claimed, inter alia, that Morris's instruction that Wright "move his legal work" on April 2

- 5 -

constituted an obstruction of justice and that Morris's filing of the April 2 misbehavior report was "in []retaliation of a complaint [Wright] filed February 27, 2003, for an assault committed against him." (Wright grievance dated April 2, 2003, at 1-2). He claimed that Morris's April 9 misbehavior report with regard to the April 2 incident was intended to interfere with Wright's legal work. (See Wright Dep. 22-23; Wright grievance dated April 9, 2003.)

The April 9 misbehavior report was summarily dismissed two days later by a DOCS sergeant. (See Action I Second Amended Complaint ¶ 14.) The charges in the April 2 misbehavior report were adjudicated in a disciplinary hearing conducted by Tiberis on April 14. (See Disciplinary Hearing, April 14, 2003, at 1-2.) Tiberis found Wright not guilty of refusing a direct order or of being out of place. However, he found that Wright had taken the newspapers back to Cavallo in violation of prison rules and that Wright was thus guilty of the two remaining charges, i.e., possessing property in an unauthorized area and unauthorized exchange of property. (See id. at 12-13.)

No misbehavior report was issued to Cavallo. The second amended complaint asserted that the bringing of disciplinary charges against Wright, a Black person, but not against Cavallo, a White person, denied Wright equal protection. (See Action I Second Amended Complaint ¶ 15.)

The second amended complaint demanded damages against each defendant in his individual and official capacity in the amounts

- 6 -

of "$3,600 Zillions dollars; $3,600 Tillions dollars; $3,600 Billions dollars; $3,600 Millions dollars; $3,600 Thousands dollars." (Id. ¶ 19.)

In November 2003, Wright sought permission to insert another claim in his second amended complaint; he proposed to name additional COs as defendants, including M. Kasunic, asserting that he had been assaulted and retaliated against by Kasunic in May 2003. However, the document Wright proffered was a fragment of a pleading to be inserted as a supplement to his second amended complaint, and the court denied his request because court rules required that any amended complaint be a complete pleading. Rather than proffering a complete third amended complaint, Wright commenced a second action.

B. The Second Action ("Action II")

In Wright's second action, his pleading consisted of a short document labeled a complaint (but containing no factual allegations) plus an expressly incorporated accompanying affidavit containing numbered paragraphs that set out, inter alia, Wright's factual allegations (collectively "Action II Complaint" or "Complaint"). The Action II Complaint named as individual defendants Goord and COs A. Dire ("Dirie"), M. Dermutt ("McDermott"), and Kasunic, and reiterated the allegations made in Action I as to, inter alia, Brandel's assault on Wright in early February, the comment that Wright did not like "Crackers," the COs' return of Brandel's cane to Brandel construed by Wright as a

- 7 -

threat of attack by the COs, and Wright's letter of complaint to the county district attorney. (See Action II Complaint ¶¶ 9-13.) Paragraph 14 of the Complaint began with the word "Retaliation" and described events of May 4, 2003. Paragraphs 14 and 15 alleged that Wright, 66 years of age in May 2003 and suffering from emphysema, returned from a "Retreat" to his cell in the hospital ward to access his oxygen tank; while using the oxygen Wright was fixing a cup of coffee, but he needed to get hot water from the day room. The Complaint went on to allege that when Wright went into the day room, he

> was assaulted by C.O. M. Kasunic, . . . trying to throw [Wright] to the floor. To try and make him spill his hot coffee on him, but [Wright] let the cup dropped to the floor. Then Kasunic, started kicking his cup around the day room. "When I tell you to do something. Dont be asking me any question, Just do it."

(Id. ¶ 16.)

The Complaint alleged that Kasunic, in an attempt to cover up his assault of Wright and in an act of systematic criminal coercion, filed a misbehavior report against Wright. (See id. ¶¶ 17-18.) This misbehavior report was adjudicated in a disciplinary hearing conducted by McDermott (see id. ¶ 18), at which Wright described Kasunic's alleged assault (see Part I.C. below). The misbehavior report was upheld by McDermott, whose decision was affirmed by Dirie. (See Action II Complaint ¶¶ 18-19.)

C. Wright's Deposition and Hearing Testimony and the Summary
Judgment Motions

Wright's first action had been assigned to Judge Lawrence E. Kahn; his second action was assigned to Chief Judge Norman A. Mordue. Although the actions were not consolidated, defendants took a single deposition of Wright for the two actions.

At his deposition, Wright described the February 6 cane incident, introduced in Action I and reiterated in Action II, much as it was described in his pleadings. The COs separated Wright from Brandel that night by moving Wright to another room in the medical ward, where he had a new cellmate. (See Wright Dep. 13-15.) Although Wright testified that he did not know which COs had come to his cell on February 6 (see id. at 17-18), he testified that Kasunic was not one of them:

> A. . . . Kasunic wasn't there that day, but the next day.
>
> Q. The next day?
>
> A. Kasunic said, "You don't like crackers."
>
> I said, "What? What do you mean? I don't like crackers."
>
> He said, "Yeah. You don't like crackers." But he used to do it when nobody was around, so I ignored him.

(Id. at 35.)

When asked how he knew that the cane had been returned to Brandel on February 26, Wright responded "[b]ecause I seen him back with the cane." (Id. at 16.) Wright testified that when he complained--saying "'[t]his man hit me with the cane. You're going to give him back the cane?'"--the person to whom he

- 9 -

complained "said the medical department gave it back to him." (Id.)

With respect to the April 2 newspaper incident, Wright reiterated his complaint of disparate enforcement of prison rules:

> Q. There is a rule here in the prison that inmates are not supposed to trade and collect each other's property, isn't that right?
>
> A. I guess so. But then why did I get a ticket instead of George?

(Wright Dep. 23; see also id. at 19 (testifying that Morris instructed another CO to "'[g]ive the nigger a ticket.'").)

As to the misbehavior report filed by Morris on April 9 with respect to the April 2 newspaper incident, Wright testified that he attributed that report to an effort by Morris to stop Wright from working on his legal papers, but that Morris "didn't put it like that." (Id. at 23.) Wright testified that his legal papers related to his "conviction." (Id. at 19; see also Action II Complaint ¶ 10 (Wright's legal papers contended that his service of the 15-years-to-life term of imprisonment, imposed on him in 1982, should have been completed in January or February 1991).)

With respect to the alleged assault by Kasunic, Wright testified as follows:

> Q. Did Officer Kasunic assault you physically?
>
> A. Yes, he did.
>
> Q. Tell me about that.
>
> . . . .

A. I come down from a prayer meeting that they had upstairs in the dayroom, just like this upstairs, and I think the date was May 4, 2003.

Q. Yes.

A. Okay. And I'm struggling to get to my air, because they didn't allow the air, so I had the concentrator. It doesn't work by battery. So I'm trying to get to my room so I can get air. So when the air come on, I took in air like I did today, and I came down to fix me a cup of coffee.

Q. You came down to this room, dayroom to get yourself some coffee?

A. Right. And Kasunic approached me, told me I got to throw it away. I looked at him and I said, "For what?"

He said, "Because was [sic] already out you can't leave and come back." I just came from upstairs. So when I didn't throw it away now--

. . . .

A. When I didn't throw it away--I'd like to stop at this point because here--because I have had an operation on my colon, right, and this is where he tried to grab me in the neck. I dropped the cup of coffee and I was down like this.

Q. With your body, you're leaning forward, putting your hands on your thighs, catching your breath?

A. Yes. At the time--he threw my cup around the room.

. . . .

A. First he kicked my cup around the room, and at that time I thought the man was going completely out of his mind. I was looking at him. And so I walked outside and one officer put the cup on the railing outside the door. Do you know the railings out there? So I picked it up, I picked the cup up from there . . . .

Q. Well, let me just make sure we've got our details straight. You said when Kasunic put his hands on you, he puts one hand around the base of

- 11 -

your neck and the other hand around you[r] abdomen, around your stomach area, and used force to stand you up, stand you up onto your feet?

A. No, he used force to try to cause injury, and I was backing off of him. I had dropped my cup, and I was backing off of him, you know. You know, I stopped the force with me from my neck, and I stopped the force where I had the operation.

Q. You used your hands to push his hands off of you?

A. Right.

Q. Okay.

A. And after I dropped my coffee, he went kicking my cup around the dayroom.

     . . . .

Q. So after the two of you physically separated, he then concentrated his attention on your coffee cup, which was bouncing around the floor?

A. Which he was kicking around the floor.

     . . . .

Q. . . . . So as he was kicking the coffee cup around. You walked under your own power through one of these two doors into the hallway here?

A. After I got my breath back.

Q. You got your breath back, okay. Did you have the oxygen concentrate machine with you at this moment?

A. No.

Q. So you had no medical equipment with you. You're walking without oxygen support?

A. I'm not sure, but I think somebody brought the tank down to escort me back to my room.

     . . . .

Q. And where was Kasunic at that time?

A.  I don't know.  He was back at his desk.  And I picked up my cup and went on about my business.

(Wright Dep. 36-41.)

As to his claims of injury as a result of his encounter with Kasunic, Wright testified as follows:

Q.  Did you experience any physical injuries from this incident apart from your shortness of breath?

A.  It's hard to say, because I have a respiratory problem.  All that stems from a respiratory problem . . . .

Q.  You had several minutes where you had some acute shortness of breath, is that what you're saying?

A.  Right.  By that time I couldn't move. . . . Back then I couldn't even move at all.  That's why I stood there with my hands on my thighs, trying to get myself together.

Q.  You allege that you suffer from emphysema, is that right?

A.  Emphysema, yeah.

Q.  When did you develop that?

A.  . . . back in '99.

(Id. at 42-43.)  Wright testified that his emphysema at the time of his deposition in 2005 was about the same as it had been in 2003 (see id. at 57).

Although Wright testified that Kasunic, while placing one hand on the back of Wright's neck, had grabbed Wright's abdomen at the site of Wright's colon surgery (see id. at 38-39), he did not testify that he suffered any pain at that site.  The colon surgery to which Wright referred had taken place in mid-December 2001 (see, e.g., Letter from Melvin Wright in Action II to Clerk of the

- 13 -

District Court dated August 29, 2005 ("Wright Action II Letter to Court"), at 1), and the surgical staples had been removed sometime between December 2001 and August 2002 (see Wright Dep. 51-52; Wright Action II Letter to Court at 1).

With respect to the Action II Complaint's allegation of retaliation, Wright testified in his deposition as follows:

Q. In your complaint, I'm going to back track a little bit to the May 4, 2003 incident with Officer Kasunic. In your complaint in Paragraph 14 you state that this incident was retaliation.

In federal litigation that's a term that means a certain thing. Are you alleging that Officer Kasunic retaliated against you or his behavior towards you was retaliation for something?

A. Yes.

Q. What was he retaliating against?

A. The fact that Brandell [sic] told him that the staff--that I don't like crackers and the word went around that I don't like crackers.

Q. So if Kasunic was retaliating against you, it's because he believed you--he believed you were a racist and you didn't like white people. Is that what he was retaliating about?

A. Yes.

(Wright Dep. 48-49.)

After taking Wright's deposition, defendants moved for summary judgment dismissing his complaint in each case. In support of their motions, defendants submitted Wright's deposition testimony, as well as, inter alia, records of Wright's February 27 letter to the county district attorney, Wright's grievances, and the disciplinary hearing conducted by McDermott on

- 14 -

the misbehavior report filed by Kasunic.  In that hearing, Wright described Kasunic's alleged assault on him as follows:

McDermott:  What I need to know is the exact type of assault, what did he do.  Did he punch you, grab you, kick you, what did he do?

Wright:  He tried to throw me to the ground.

McDermott:  ____ [sic] So did he grab you,

Wright:  Yes he did.

McDermott:  Where did he grab you?

Wright:  What?

McDermott:  Where did he grab you, on your body, what did he grab?

Wright:  He grabbed me.

McDermott:  Right.

Wright:  Well he tried to grab me around my neck.  He had a body hold ___ [sic] trying to throw me down and hit the wall.

McDermott:  Did you hit the ground?

Wright:  What, did I hit the ground because he told me to.  So when he got off he had my hands on my knees because I couldn't move.

McDermott:  So in the day room Kasunic grabbed you about the body and tried to throw you to the floor.

Wright:  That's right.  And that was after I came out [of] my room.

McDermott:  Now you pushed him away?

Wright:  Pushed him off me.

McDermott:  You pushed him off you?

Wright:  To get out of his hold that he had on me.

McDermott:  Then he stopped.

- 15 -

Wright: No then he kicked my cup all around the room.

McDermott: No I am talking about your physical well being. He stopped that pretty rapidly, he tried to throw you, you pushed away from him, and than [sic] he stopped assaulting you?

Wright: You already know that.

McDermott: All I want to know is about the assault.

Wright: Right.

McDermott: You said he grabbed you. He tried to throw you to the floor.

Wright: Well.

McDermott: You pushed away from him?

Wright: The only reason he stopped was because he seen me get ready to hit him.

McDermott: All he was worried about was your fists. Your fist.

Wright: Yeah.

McDermott: Okay.

Wright: _____ [sic] (inmate is mumbling) he stopped and started kicking my foot.

McDermott: Did he touch you ____ [sic]

Wright: _____ [sic]

McDermott: Did he touch you again?

Wright: Not after that.

(Disciplinary Hearing, May 14, 2003 ("May 14 Disciplinary Hrg."), at 9-10.)

In Action I, defendants contended that summary judgment dismissing the second amended complaint was appropriate on a variety of grounds, including lack of evidence of any injury to

- 16 -

Wright or any disciplinary action against him in connection with the February cane incident. With respect to the April newspaper incident, defendants asserted in a statement of undisputed facts pursuant to Local Rule 7.1 of the Northern District of New York ("Local Rule 7.1") that Wright, in his grievances and his disciplinary hearing testimony, had neither alleged any misbehavior by Cavallo nor complained of any racially disparate treatment. Defendants contended that there was no evidence of any arbitrary action by Morris.

In Action II, defendants contended that summary judgment dismissing the Complaint was appropriate because, inter alia, Wright's own testimony showed (a) that, in the May 4 incident, Wright had experienced only a few minutes' shortness of breath, and (b) that any force used by Kasunic against Wright was not excessive.

Wright opposed summary judgment in each action, submitting in each an affidavit in which he asserted that prison officials were aware of "officers who allegedly wrote false disciplinary report[s], . . . and obstacles to protect from corrections officers that caused [Wright] to suffered physical injuries and emotional trauma." (Affidavit of Melvin O. Wright in Action I, dated August 15, 2005 ("Wright Aug. 15, 2005 Aff."), ¶ 6; see Affidavit of Melvin O. Wright in Action II, dated August 19, 2005, ¶ 7.) And in each action Wright sent an unsworn letter to the district court stating that he had been "attack[ed] or assaulted by another inmate February 6, 2003; and threaten[ed] by

corrections officers from April 2, 2003, to May 4, 2003, after being assaulted by an officer" and that these events caused him mental anguish, physical and psychic injuries, sensation of pain, and feelings of distress, fright, and anxiety. (Letter from Melvin Wright in Action I to Clerk of the District Court dated August 29, 2005 ("Wright Action I Letter to Court"), at 1-2; Wright Action II Letter to Court at 1-2). Wright did not submit in either action any statement of disputed facts pursuant to Local Rule 7.1.

D. The District Court Decisions

In each action, the defendants' summary judgment motion was referred to a magistrate judge for report and recommendation. In Action I, in a Report and Recommendation dated February 27, 2006 ("Action I Report"), adopted by and reprinted with the district court's subsequent Decision and Order, see Wright v. Goord, No. 03 Civ. 0743, 2006 WL 839532 (N.D.N.Y. Mar. 27, 2006) ("Wright I"), at *1, Magistrate Judge David E. Peebles recommended dismissing the second amended complaint in its entirety. The magistrate judge recommended, inter alia, that Wright's claims for money damages against DOCS and the individual defendants in their official capacities be dismissed on the ground of Eleventh Amendment immunity; he recommended that all of the claims against Commissioner Goord be dismissed for lack of any evidence of his personal involvement in the alleged constitutional violations. See id. at *6. As to Wright's remaining claims--construed as

- 18 -

(1) Eighth Amendment and substantive due process claims based on the COs' failure to protect Wright from Brandel in the February 2003 cane incident, and (2) equal protection and procedural due process claims based on the bringing of disciplinary proceedings against Wright but not Cavallo with respect to the April 2003 newspaper incident--the magistrate judge recommended that those claims be dismissed on the merits for lack of evidentiary support as to essential elements of the claims. See id. at *7-*11.

Wright filed objections to the Action I Report, simply reiterating in affidavit form most of the factual allegations in the second amended complaint. (See Affidavit of Melvin O. Wright dated March 7, 2006 ("Wright Mar. 7, 2006 Aff."), at 2-5 (setting out the allegations made in paragraphs 6-10, 12, 15, and 16 of the second amended complaint).)

Judge Kahn, in a Decision and Order dated March 27, 2006, after undertaking a de novo review of the record and considering Wright's objections, approved and adopted the Action I Report and granted defendants' motion for summary judgment dismissing the second amended complaint. See Wright I, 2006 WL 839532, at *1.

In Action II, in a Report and Recommendation dated March 1, 2006 ("Action II Report"), adopted by and reprinted with the district court's subsequent Memorandum-Decision and Order, see Wright v. New York State Department of Correctional Services, No. 04 Civ. 0308, 2006 WL 752787 (N.D.N.Y. Mar. 22, 2006) ("Wright II"), at *1, Magistrate Judge Gustave J. DiBianco recommended granting defendants' summary judgment motion in its

entirety. Wright's Action II claims against DOCS had been dismissed previously; in the Action II Report, the magistrate judge recommended dismissing the claims against all of the individual defendants except Kasunic on the ground that there was no evidence of their personal involvement in the events giving rise to those claims.

As to Kasunic, the magistrate judge determined that Wright had stated an Eighth Amendment claim based on Kasunic's alleged assault during the May 2003 coffee incident but recommended that that claim be dismissed. Citing Wright's testimony in his deposition and in the May 14 disciplinary hearing, the magistrate judge concluded that the amount of force used was de minimis, that Wright suffered no injury, and that even viewing the evidence in the light most favorable to Wright, no reasonable factfinder could conclude that Kasunic used excessive force during the coffee incident. See Wright II, 2006 WL 752787, at *6.

The magistrate judge also concluded that Wright had stated a First Amendment claim that Kasunic had retaliated against Wright because Kasunic believed Wright was a racist. However, the magistrate judge recommended dismissing that claim on the ground that "[t]he alleged dislike of white people is not a constitutionally protected activity." Id. at *8.

Wright objected to the Action II Report by reiterating most of the factual allegations in his Action II Complaint. (See Wright Affidavit In Support of Objections Motion dated March 11, 2006 ("Wright March 11, 2006 Aff."), at 2-7 (setting out the

- 20 -

allegations made in paragraphs 9-14, and 16-19 of the Complaint).) Chief Judge Mordue, in a Memorandum-Decision and Order dated March 22, 2006, considered Wright's objections, conducted a de novo review of the record, accepted and adopted the Action II Report, and granted defendants' motion for summary judgment dismissing the Action II Complaint. See Wright II, 2006 WL 752787, at *1.

Judgments were entered dismissing Wright's complaints, and these appeals followed.

E.    The Issues on Appeal

As briefly indicated above, in connection with an application by Wright in this Court for assignment of counsel to represent him in challenging the decisions of the district court, this Court reviewed Wright's claims in order to determine whether they could be pursued consistent with 28 U.S.C. § 1915(e) ("The court may request an attorney to represent any person unable to afford counsel," but "the court shall dismiss the case at any time if the court determines that . . . the . . . appeal . . . is frivolous . . . [or] fails to state a claim on which relief may be granted; or . . . seeks monetary relief against a defendant who is immune from such relief."). We dismissed so much of Wright's appeal as sought to pursue his claims with respect to equal protection, procedural due process, and failure to provide protection from Brandel, concluding that "the appeal of the district court decision dismissing those claims lacks an arguable basis in fact or law. See Neitzke v. Williams, 490 U.S. 319, 325

- 21 -

(1989); 28 U.S.C. § 1915(e)." Wright v. Goord, No. 06-1808 (2d Cir. Sept. 22, 2006) ("Wright III"), at 1. Our order appointed counsel to represent Wright with respect to the claims as to which his appeal was not dismissed, mentioning in particular his "claim that the defendants violated his Eighth Amendment rights when he was assaulted and intimidated by correctional officers at Coxsackie Correctional Facility." Id. at 1-2.

Appointed counsel argues that in both Wright I and Wright II, the district court erred in granting summary judgment dismissing Wright's Eighth Amendment claims and in dismissing claims that the Coxsackie COs violated the First Amendment by retaliating against Wright for filing grievances.

## II. DISCUSSION

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); McPherson v. Coombe, 174 F.3d 276, 279-80 (2d Cir. 1999). A genuine issue of fact means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see, e.g., Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.

1996) (a genuine issue is one that "can 'reasonably be resolved in favor of either party'" (quoting <u>Anderson</u>, 477 U.S. at 250)).

We review a district court's decision to grant summary judgment <u>de novo</u>, <u>see</u>, <u>e.g.</u>, <u>Johnson v. Goord</u>, 445 F.3d 532, 534 (2d Cir. 2006), "'resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought,'" <u>id</u>. (quoting <u>Terry v. Ashcroft</u>, 336 F.3d 128, 137 (2d Cir. 2003)); <u>see</u>, <u>e.g.</u>, <u>Graham v. Henderson</u>, 89 F.3d at 79 ("The evidence of the party opposing summary judgment is 'to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" (quoting <u>Anderson</u>, 477 U.S. at 255)). When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth "specific facts" demonstrating that there is "a genuine issue for trial." Fed. R. Civ. P. 56(e).

A. <u>The Eighth Amendment Claims of Cruel and Unusual Punishment</u>

1. <u>Action I</u>

Plaintiff contends that the district court in <u>Wright I</u> erred in dismissing the Action I claim for use of excessive force because the court failed to construe liberally the "complaint and other documentation" that he contends "demonstrate[d] an Eighth Amendment claim based on an ongoing campaign of harassment and

intimidation against [Wright] that began with verbal threats and harassment and culminated in a physical assault." (Wright brief on appeal at 13.) For several reasons, even with all justifiable inferences drawn in Wright's favor, the record does not support this characterization of Wright's pleading and submissions in Action I.

First, the only concretely alleged physical assault by a corrections officer in either of Wright's lawsuits was the alleged assault by Kasunic. That claim, however, was not asserted in Action I. Although Wright attempted to add his claim of a Kasunic assault to Action I, he was informed that simply appending that claim to his second amended complaint, as he sought to do, was not permitted by court rules. Wright then elected to commence a new lawsuit to assert the Kasunic assault claim rather than filing a third amended complaint to assert that claim in Action I. Thus, the alleged assault on Wright by Kasunic was not part of Action I.

Second, although the cane incident alleged in Action I involved an assault on Wright, that was an assault by Brandel, his cellmate. This Court's order in Wright III affirmed the Wright I rejection of any claim that corrections officers had improperly failed to protect Wright from Brandel. And there was no allegation or proffer of proof in Action I of any physical assault on Wright by any corrections officer.

Third, although paragraph 10 of the second amended complaint in Action I, which is set out in full in Part I.A. above, referred to an "intentional display of force such as was

- 24 -

shown that night of February 26, 2003," that phrase was the only suggestion in the case that there had been any display of force on February 26. The pleading itself contained no allegation that in fact any force had been used on February 26. Similarly, although paragraph 10 also made reference to pre-February 26 "threats to inflict injury upon [Wright]," this offhand suggestion that there had been such threats was entirely conclusory and was not detailed elsewhere in the pleading. And nothing in Wright's affidavits provided any basis for inferring that any use of force had occurred on February 26 or that any officer had threatened Wright with physical injury before that date.

Finally, to the extent that paragraph 10 of the second amended complaint was intended to suggest that corrections officers, upon learning that Brandel had hit Wright with the cane, returned the cane to Brandel on February 26 so that he could assault Wright again (see also Wright brief on appeal at 8 ("on February 26, 2003, prison staff returned the cane to Mr. Wright's cellmate . . . , thereby re-arming Wright's assailant")), Wright proffered no evidence to support that suggestion. Indeed, Brandel was no longer Wright's cellmate, Wright having been moved to a new cell on February 6. And Wright's deposition testimony revealed that Wright had no information about the return of the cane to Brandel except that he saw Brandel with the cane and, upon complaining that Brandel had previously hit him with the cane, Wright was informed that the cane had been returned to Brandel not by security officers but by the medical staff.

Wright's brief on appeal states that on February 26, _i.e._, the

> same day [that the cane was returned to Brandel], officers, including defendant-appellee Morris, accosted Mr. Wright, shouting and taunting him about the cane . . . and the alleged "cracker" comments. . . . By their shouting and threatening posturing, the officers convinced Mr. Wright that they all were about to assault him.

(Wright brief on appeal at 8). But the record citations accompanying this statement are only to Wright's pleadings, which were conclusory, and to deposition testimony describing events of April 2 and February 6, not February 26 (_see_ _id_. at 8-9). There was no factual allegation in the second amended complaint as to any instance on which any CO threatened to subject Wright to physical injury. Nor did Wright adduce any evidence of such a threat.

In sum, nothing in the papers submitted by Wright in Action I permitted the inference that Wright had been assaulted, or threatened with personal injury, by a corrections officer. We conclude that the _Wright I_ court properly dismissed Wright's Eighth Amendment claims in Action I.

2. _Action II_

The Complaint in Action II did allege in nonconclusory terms that Wright had been subjected to excessive force by Kasunic on May 4 during the coffee incident. However, we agree with the _Wright II_ court that Wright's own testimony would prevent a rational juror from finding in his favor on this claim.

- 26 -

Analysis of a claim for use of excessive force begins with "identif[ication of] the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989); see generally Baker v. McCollan, 443 U.S. 137, 140 (1979) (the first step in analysis of any claim brought under § 1983 is to identify the precise constitutional right allegedly violated). In the context of a claim by a prisoner that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments. The validity of the prisoner's claim must "be judged by reference to th[is] specific constitutional standard . . . , rather than to some generalized 'excessive force' standard." Graham v. Connor, 490 U.S. at 394; see, e.g., Whitley v. Albers, 475 U.S. 312, 318-26 (1986) (claim of excessive force to subdue convicted prisoner is to be analyzed under an Eighth Amendment standard).

A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components--one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. See, e.g., Hudson v. McMillian, 503 U.S. 1, 7-8 (1992); Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness'" in light of the particular circumstances surrounding the challenged conduct. Id. at 262 (quoting Wilson v. Seiter, 501 U.S. 294, 299

- 27 -

(1991)); see, e.g., Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000); Davidson v. Flynn, 32 F.3d 27, 30 & n.2 (2d Cir. 1994). When prison officials are accused of using excessive force, the "wantonness" issue turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7; see also Blyden v. Mancusi, 186 F.3d at 262-63.

The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of "contemporary standards of decency." Hudson, 503 U.S. at 8 (internal quotation marks omitted). In assessing this component, the court must ask whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Id. (quoting Wilson, 501 U.S. at 298). But when prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated. . . . This is true whether or not significant injury is evident." Hudson, 503 U.S. at 9.

Accordingly, where a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically, our Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak. See, e.g., Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence

of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury"); Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (vacating district court's sua sponte dismissal of prisoner's complaint, though characterizing his "excessive force claim [a]s weak and his evidence [as] extremely thin" where prisoner alleged that he was hit by prison guards "after he was handcuffed" but "the only injuries he suffered were a bruised shin and swelling over his left knee").

Nonetheless, the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 10 (internal quotation marks omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" Id. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

In the present case, Wright's evidence with respect to his claim that Kasunic violated his Eighth Amendment rights by grabbing him in the dayroom on May 4 falls far short of even the level of evidence that we termed "thin" in Scott v. Coughlin and Griffin v. Crippen, and was insufficient with respect to both the objective and subjective components of the Eighth Amendment claim asserted in Action II.

As to the objective component, Wright's description of the coffee incident does not permit a finding that Kasunic's alleged conduct was "objectively 'harmful enough' to establish a constitutional violation." Hudson, 503 U.S. at 8. Apart from the several minutes during which he experienced acute shortness of breath, Wright could not say that he experienced any physical injuries from his encounter with Kasunic. (See Wright Dep. 42.)

Wright testified that he spent a few minutes leaning forward with his hands on his thighs, and "got [his] breath back." (Wright Dep. 38, 40.) Someone brought Wright an oxygen tank (see id. at 41), and Wright testified that he then left the dayroom: Kasunic "was back at his desk. And I picked up my cup and went on about my business" (id.).

Further, although in describing Kasunic's conduct, Wright said that Kasunic had placed a hand on the site of Wright's colon surgery, Wright did not testify that this had caused him any pain at that site. Indeed, when expressly questioned at his deposition as to what injuries he claimed to have suffered as a result of his encounter with Kasunic, Wright did not testify that Kasunic's actions caused him any pain whatever--physical or emotional--other than the shortness of breath.

In sum, although Wright stated conclusorily in some of his submissions to the district court in opposition to defendants' motions for summary judgment that he had suffered "physical . . . injuries" (see, e.g., Wright Aug. 15, 2005 Aff. ¶ 6), neither his deposition testimony nor any other evidentiary material in the

record reveals that as a result of the May 4 coffee incident Wright suffered any physical injury other than a few minutes' shortness of breath. Plainly, given his testimony, any injury to Wright was de minimis.

As discussed above, the absence of any significant injury to Wright does not end the Eighth Amendment inquiry, for our standards of decency are violated even in the absence of such injury if the defendant's use of force was malicious or sadistic. But the record here does not permit an inference that Kasunic acted in such a manner or with such intent.

When Wright was asked at the May 14 disciplinary hearing whether Kasunic had punched, kicked, or grabbed him, Wright testified only that Kasunic grabbed him and attempted to throw him to the ground. (See May 14 Disciplinary Hrg. at 9-10.) Wright's brief on appeal cites a strength disparity between Wright and Kasunic (see Wright brief on appeal at 7, 17), a disparity that is acknowledged by Kasunic in a June 3, 2003 memorandum to a DOCS sergeant and is easily inferable in recognition of Wright's age-- nearly 66--at the time of the incident. But the mere existence of greater strength does not mean that such strength was used, and Wright's deposition testimony definitively negates any possibility that Kasunic used his greater strength during the coffee incident. Wright testified:

> [Kasunic] used force to try to cause injury, and I was backing off of him. I had dropped my cup, and I was backing off of him, you know. You know, I stopped the force with me from my neck, and I stopped the force where I had the operation.

- 31 -

Q. You used your hands to push his hands off of you?

A. Right.

(Wright Dep. 38-39.) Similarly, at his disciplinary hearing, Wright testified that he "[p]ushed [Kasunic] off" (May 14 Disciplinary Hrg. at 10).

Finally, although Wright stated that Kasunic had placed one hand on Wright's abdomen at the site of his colon surgery, there was no evidence that that placement was sadistic or malicious. Wright did not testify that Kasunic knew or had reason to know that his abdomen was unusually tender. Nor does the record reveal any basis for inferring that Kasunic would have been aware that it was a surgical site. Wright's surgery had been performed some 17 months earlier--and some eight months before Wright became an inmate at Coxsackie.

In sum, the evidence was that Kasunic grabbed Wright, and Wright pushed him away; while Wright leaned over to catch his breath, Kasunic kicked Wright's coffee cup around the room, but only the coffee cup was abused. After the few minutes needed to catch his breath, Wright left the dayroom, took his cup, and "went on about [his] business." As a matter of law, this record would not permit a rational factfinder to find that Kasunic subjected Wright to excessive force or cruel and unusual punishment. Summary judgment dismissing this claim was proper.

B. _Retaliation_

   1. _Action I_

Plaintiff contends that the district court erred in failing to read Wright's papers in Action I sufficiently liberally to conclude that Wright asserted a claim of retaliation. The argument is that Wright filed a grievance in April 2003 alleging that Morris filed the April 2 misbehavior report with regard to the newspaper incident in retaliation for Wright's having complained to the county district attorney on February 27 with respect to the cane incident, and that the April 2003 grievance was incorporated by reference into the Action I Second Amended Complaint. We reject that argument.

First, we see no indication in the record that either of the grievances filed by Wright against Morris with respect to the April 2 newspaper incident was attached to the second amended complaint. Second, a claim of retaliation was not integral to the claim that Wright alleged with respect to the newspaper incident, _i.e._, the equal protection claim that Morris's issuance of a misbehavior report against Wright and not against Cavallo constituted disparate treatment based on race. (See, _e.g._, Action I Second Amended Complaint ¶ 15; Wright Dep. 19, 23.) Indeed, in the sections of the second amended complaint that allege "Facts" and "Causes of Action" (see Action I Second Amended Complaint ¶¶ 6-22), there is but one terse--and largely incomprehensible--mention of Wright's April grievance:

> Officer A. Morris, yelled from A desk to officer Zimber at B desk to give that nigger a ticket; Tape

no. 03-0858, of witnesses; and Grievance no. CX-9520-03, expired past the 12 working days limitation.

(Id. ¶ 12.)

There was a clearer statement in the second amended complaint that Wright had filed a grievance against Morris with regard to the April 2 incident; but that statement was made in the preliminary sections of the pleading, which followed a form promulgated by the United States District Court for the Northern District of New York for "Inmate Civil Rights Complaint[s] Pursuant to 42 U.S.C. § 1983." Given that prisoners are required to exhaust certain claims administratively before bringing suit in federal court, see 42 U.S.C. § 1997e(a), the form required that, before asserting facts and causes of action, a plaintiff provide information as to, inter alia, whether his place of confinement had a grievance procedure, if so whether he had pursued his claims in the grievance procedure, and if not whether he had complained to prison authorities about the facts alleged in his complaint. Wright's pleadings followed this format. (See, e.g., Action I Second Amended Complaint ¶ 4.) And although paragraph 4 of the second amended complaint asserted, more clearly than did the "Facts" and "Causes of Action" sections of the pleading, that Wright had filed a grievance against Morris, paragraph 4 did not disclose that the grievance claimed that Morris's misbehavior reports against Wright constituted retaliation. Indeed, no form of the word "retaliation" appeared anywhere in the second amended complaint.

Understandably, the magistrate judge did not mention a claim of retaliation in making his recommendation to the district judge for the disposition of the second amended complaint. Wright lodged objections to the Action I Report; but they did not include an objection that that report failed to address a claim of retaliation. We view Wright's failure to make that objection as confirmation of our view that he had no belief that he had asserted a retaliation claim in Action I. And if in fact he had intended to assert and believed he had asserted such a claim, he waived his right to challenge the dismissal of that claim on appeal by failing to make a retaliation-claim-related objection to the Action I Report's recommendation that the second amended complaint be dismissed in its entirety.

Finally, we note that Wright's counsel on these appeals appears to argue that Morris's April 9 misbehavior report was filed in retaliation for Wright's filing the grievance on April 2, which in turn was based on the misbehavior report Morris had filed against Wright on April 2. (See Wright brief on appeal at 24 ("When [Wright] filed a . . . complaint, on April 2, 2003, . . . Morris again retaliated, filing new charges against [Wright] based on the very same incident."). Wright, however, did not make this argument in the district court. Rather, in the district court proceedings, as described in Parts I.A. and I.C. above, Wright claimed only that Morris filed the April 9 misbehavior report in order to interfere with Wright's legal work. (See Wright Dep. 22-23; Wright grievance dated April 9, 2003.) Given

that Wright raises this new retaliation contention for the first time on appeal, and indeed made an entirely different claim with respect to the April 9 misbehavior report in the proceedings before the district court, we decline to address the new contention. See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 124 n.29 (2d Cir. 2005) ("'The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not presented below, . . . waiver will bar raising the issue on appeal.'" (quoting United States v. Braunig, 553 F.2d 777, 780 (2d Cir. 1977)).

    2.  Action II

        Plaintiff argues that the district court erred in dismissing Wright's retaliation claim in Action II by failing to consider that the defendant COs may have retaliated against Wright for filing grievances. We have several difficulties with this argument.

        To begin with, the Action II Complaint, although describing Kasunic's alleged assault of Wright on May 4 as "Retaliation" (Action II Complaint ¶ 14), does not identify the actions of Wright for which Kasunic allegedly retaliated. At his deposition, Wright testified as follows:

                Q.  . . . . Are you alleging that Officer
        Kasunic retaliated against you or his behavior
        towards you was retaliation for something?

                A.  Yes.

                Q.  What was he retaliating against?

- 36 -

A. The fact that Brandell [sic] told him that the staff--that I don't like crackers and the word went around that I don't like crackers.

Q. So if Kasunic was retaliating against you, it's because he believed you--he believed you were a racist and you didn't like white people. Is that what he was retaliating about?

A. Yes.

(Wright Dep. 49; see also id. at 35 (testifying that Kasunic had commented on Wright's purported dislike of "crackers").) Accordingly, the district court reasonably viewed Wright's Action II retaliation claim as asserting that Kasunic retaliated against Wright because Kasunic believed Wright was a racist.

The claim of retaliation on that basis was expressly abandoned by Wright's counsel on this appeal. At oral argument, when asked what Wright contended was the basis for Kasunic's retaliatory animus, counsel responded as follows:

COUNSEL: Retaliation for his complaint to the district attorney, which he had made on February 27th.

As the court may be aware, the problems began on February 6th when a cellmate attacked Mr. Wright with a cane and then to cover up the assault, the cellmate accused Mr. Wright of calling his cellmate a cracker, which is a derogatory term for a white person.

The prison guards heard about the false statement and came to the mis-conclusion that Mr. Wright was a bigot and began to threaten and to intimidate him. He is not claiming retaliation for that . . . .

THE COURT: . . . . I'm sorry, he's not claiming retaliation for, for what?

COUNSEL: For the guard's misperception that he was a bigot.

- 37 -

(Tape of oral argument (emphases added).) Although on this appeal, in which Wright is represented by counsel, it is now clarified that Wright's claim is that he was retaliated against for filing grievances, this could not have been clear to the district court. In objecting to the magistrate judge's recommendations in Action II, Wright repeated nearly verbatim the allegations in his Complaint and added that the defendant corrections officers were motivated by the desire for revenge and that their misbehavior reports were filed, and that Kasunic assaulted him, "for the sole purposes of 'retaliation' and 'revenge.'" (Wright March 11, 2006 Aff. at 7.) But Wright did not specify the supposed reasons for the alleged desires for retaliation and revenge. Given Wright's explicit and unambiguous deposition testimony that his claim was that Kasunic retaliated against Wright because Kasunic "believed [Wright] w[as] a racist" (Wright Dep. 49), it is difficult to fault the district court for not viewing Wright as claiming that he was being retaliated against for exercising his First Amendment right to file grievances.

Wright's counsel at oral argument of this appeal specified that Wright "is claiming retaliation because . . . of the letter that he wrote to the district attorney saying that he feared for his physical health because the guards threatened and harassed him." (Tape of oral argument.) That February 27 letter to the county district attorney was indeed mentioned in paragraph 12 of Wright's Action II Complaint, which reiterated his Action I Second

- 38 -

Amended Complaint allegations with respect to the February 2003 cane incident. The letter itself, which was one of the documents submitted by defendants in support of their motion for summary judgment in Action I, read as follows:

Dear Sir:

Any willful attempt or threat to inflict injury upon the person of another, when coupled with an apparent present ability so to do, and any intentional display of force such as would give the victim reason to fear or expect immediate bodily harm, constitutes an assault.

Approximately, about the week of February 6, 2003, inmate Brandel, Id. 00-B-0791, here in some kind of protected custody (P.C.) as a patient in the hospital infirmary (allegedly); attacked inmate Wright, with his walking cane by hitting him on his head with it. Then inmate Brandel, [ran] to the emergency nurse bell and pushed it asking for security. When security arrived inmate Brandel, reversed the incident and told them Wright, hit him with the cane, at 11:30 p.m., and called him a "Cracker," with the cane still in his hand, pursuant to Correctional Law Sections 52.19, 114. A, and 138.4; Title 18 U.S.C. Sections 241, 242, and 18 U.S.C. § 3041(F).

Then security removed Wright, from his room and gave the room to Brandel, and took his cane, and then gave it back to him February 26, 2003. This complaint is based on lack of security or racism, (Emphasis yours)?

Sincerely submitted

MELVIN O. WRIGHT, SR.

(Letter from Melvin O. Wright to Prosecutor's Office dated February 27, 2003.)

Even if a claim of retaliation for having written this letter were properly preserved for appeal, we could not agree that it was error to dismiss Wright's Action II retaliation claim. The

- 39 -

district court correctly found that the Action II Complaint alleged that the retaliatory act was Kasunic's assault on Wright during the coffee incident. Other than Kasunic, the only individual defendants named in the Action II Complaint were Goord, McDermott, and Dirie, none of whom was alleged to have participated in that event. Wright's D.A. Letter complained of the cane incident; but neither Kasunic nor any other officer was named in that letter. Wright testified that Kasunic in fact was not one of the officers who came to Wright's cell after Wright was hit with the cane on February 6. And Wright had no reason to believe that Kasunic was involved in returning the cane to Brandel, as Wright was informed that the cane had been returned by the medical staff.

Given this record, no rational juror could conclude that if Kasunic assaulted Wright, it was in retaliation for Wright's having written, some 10 weeks earlier, a letter that did not name Kasunic or any other officers and complained of an incident in which Kasunic was not a participant.

CONCLUSION

We have considered all of plaintiff's arguments in these consolidated appeals and have found them to be without merit. The judgments of the district court are affirmed.