07-1404-cv
Loeffler v. Staten Island University Hospital

## UNITED STATES COURT OF APPEALS

### FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: March 19, 2009    Decided: October 6, 2009)

Docket No. 07-1404

- - - - - - - - - - - - - - - - - - - - - -x

JOSEPHINE LOEFFLER, as Administratrix of
the Estate of Robert A. Loeffler and
individually, ROBERT C. LOEFFLER,
and KRISTY LOEFFLER,

Plaintiffs-Appellants,

JOANNE AMORE and ANN RAPPOCCIO,

Plaintiffs

- v.-

STATEN ISLAND UNIVERSITY HOSPITAL,

Defendant-Appellee.[*]

- - - - - - - - - - - - - - - - - - - - - -x

Before:        JACOBS, Chief Judge, WESLEY, Circuit
Judge, and SAND, District Judge.[**]

---

[*]The Clerk of the Court is directed to amend the official caption to conform to the listing of the parties above.

[**] The Honorable Leonard B. Sand, United States District Court for the Southern District of New York, sitting by designation.

Appeal from an order entered in the United States District Court for the Eastern District of New York (Johnson, J.) granting summary judgment to defendant hospital. Plaintiffs alleged that the hospital failed to provide interpreting services to a patient and his wife (both deaf), so that their two children (of normal hearing) had to act as interpreters for their parents, and allege damages as a result. We conclude: (I) that the parents have raised a genuine issue of material fact as to whether the hospital acted with deliberate indifference; (II) that the children have associational standing under the Rehabilitation Act; and (III) the children's claims under the New York City Human Rights Law must be remanded for reconsideration in light of the Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005). The judgment of the district court is vacated.

Chief Judge JACOBS dissents from the majority of the panel as to Part II of this opinion; Judge WESLEY sets forth the decision of the court as to Part II in a separate opinion.

ALAN J. RICH, Brooklyn, NY, for Plaintiffs-Appellants.

ROY W. BREITENBACH, Garfunkel, Wild & Travis, P.C., Great Neck, NY, for Defendant-Appellee.

ALAN JENKINS, New York, NY, for amicus curiae The Opportunity Agenda.

DENNIS JACOBS, Chief Judge:

Josephine Loeffler, ("Josephine") acting individually and as administratrix for the estate of her deceased husband Robert A. Loeffler ("Robert"), and their two children Robert C. Loeffler ("Bobby") and Kristy Loeffler, ("Kristy"), (collectively "the Loefflers") appeal an order entered in the United States District Court for the Eastern District of New York (Johnson, J.) granting summary judgment to Staten Island University Hospital ("the Hospital").

The Loefflers allege that during Robert's heart surgery on October 27, 1995, and his subsequent stroke and convalescence, the Hospital failed to provide a sign language interpreter to Robert and his wife, who are both deaf, in violation of numerous federal, state, and local regulations, so that their two minor children--Kristy and Bobby (of normal hearing)--were forced to interpret.

The Hospital does not contest that Robert and Josephine were deaf, that it was required by law to provide an

3

interpreter, and that it failed to do so.  The district court granted summary judgment dismissing the parents' claims on the ground that, under Bartlett v. N.Y. State Bd. of Law Exam'rs, 156 F.3d 321, 331 (2d Cir. 1998), vacated on other grounds and remanded, 527 U.S. 1031 (1999), the Hospital cannot be held liable for monetary damages because its failure was not a result of "deliberate indifference." The district court dismissed the claims of the Loeffler children for lack of statutory standing.  Loeffler v. Staten Island Univ. Hosp., No. 95 CV 4549(SJ), 2007 WL 805802, at *4-10 (E.D.N.Y. Feb. 27, 2007).

For the reasons that follow, we conclude that Robert and Josephine have raised a genuine issue of material fact as to the Hospital's deliberate indifference, and we vacate the dismissal of all their claims.  We also vacate the dismissal of Kristy's and Bobby's federal claims (for the reasons set forth in Judge Wesley's concurring opinion); and we vacate the dismissal of Kristy's and Bobby's claims under the New York City Human Rights Law, in light of the New York City Local Civil Rights Restoration Act of 2005.

**BACKGROUND[3]**

Robert previously had heart surgery at the Hospital in 1991. At that time, he requested an American Sign Language ("ASL") interpreter; but though the Hospital's records reflected the need for one, none was provided. Kristy (age 12 at the time) and Bobby (age 9) interpreted for their father.

The present case concerns Robert's surgery at the Hospital in the fall of 1995. Robert was scheduled for a right carotid endarterectomy on October 27, 1995. In the days and weeks leading up to the surgery, the Loefflers made numerous attempts to secure an interpreter from the Hospital. Bobby (age 13 at the time) claims that during pre-admission testing (weeks prior to the surgery), he made a request to the operating surgeon, Dr. Nedunchezian Sithian, who "just kind of laughed it off. . . ." Numerous other requests are alleged to have been made: by Bobby ten days before the surgery, by Bobby or Kristy (age 17 at this time) four days in advance, and by Josephine the day before.

---

[3] Because this case comes to us on the grant of summary judgment against the Loefflers, we resolve all ambiguities and draw all permissible factual inferences in their favor. See Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).

5

(She says the Hospital confirmed the request).  The Hospital maintains that they have no records showing any such requests.

At the relevant time, the Hospital's policy was to provide sign language interpreters:

> When a physician, nurse or other professional staff member determines an interpreter is needed, and when in the opinion of the *patient*, effective communication cannot be established without an interpreter, the following procedure applies . . . [during business hours t]he Speech and Hearing Center staff will call the interpreters on call to arrange to provide interpretation. . . .  In the event that we cannot reach our interpreters on call, we will contact the New York Society for the Deaf.  Where the need for an interpreter is known in advance . . . arrangements are to be made in advance with an interpreter. (emphasis added)

"[P]ursuant to the policy, hospital staff or patients were to report requests for interpreting services to the Patient Representative Department" ("PRD").  Appellee's Br. at 9.  The PRD was run by its Director, Patricia Ferrara, and two "patient representatives," one of whom was Antoinette Henderson.  Requests made after hours were to go to the Assistant Director of Nursing ("ADN"), who should determine whether it is necessary to contact an interpreter "on call"

or "the New York Society for the Deaf."

**A. Events of October 27, 1995**

On the morning of the surgery, Friday, October 27, 1995, Robert and Bobby went to the PRD to request an interpreter, and were told to go upstairs to the "pre-op room" while an interpreter was sought. At the pre-op room, Bobby asserts that he again requested an interpreter from Dr. Sithian. Surgery began at noon. During the procedure, various family members visited the PRD at least four times to request an interpreter. The Hospital contends that no request for an interpreter for that hospital visit was made until 2pm or 3pm. Appellee's Br. at 9-10.

Josephine alleges that she and her sister asked Antoinette Henderson of the PRD to have an interpreter present when Robert got to the recovery room, and for a "TTY" machine, which allows the deaf to communicate (by phone or in person) with people with normal hearing, through a relay service. Henderson does not remember the Loefflers ever explicitly asking for a TTY, but recalls advising that Robert could use one if he was in a private room.

After Josephine and her sister left the PRD, Henderson began looking for an interpreter, but the Hospital's Speech

7

and Hearing Department ("SHD") asked whether the Loefflers needed an interpreter who signed ASL (the overwhelmingly predominant sign language used in the United States) or English Sign Language, and Henderson, who did not know, unsuccessfully tried to reach family members to find out.

Shortly before 4pm, Josephine (with her mother) returned to the PRD, and answered Henderson's inquiry as to which kind of interpreter was required. Henderson then got back in touch with SHD, and obtained four telephone numbers for ASL interpreters. Two numbers were out of service, and two were unanswered. (The Loefflers claim that the list was outdated.) Henderson told Josephine and her mother that no interpreter would be available that night, and suggested that they check the next morning if one was still needed. Henderson and the Loefflers disagree as to whether any objection was registered.

After the surgery, Dr. Sithian brought Bobby into the Recovery Room to interpret for his father, and told Bobby that the surgery had gone well. Bobby again asked about an interpreter, explaining to Dr. Sithian that he did not "feel comfortable doing this and . . . [did not] understand some of the terms." Dr. Sithian assured Bobby that he was "doing

8

just fine." According to Bobby, Dr. Sithian "patted me on the back, and laughed it off like usual." Dr. Sithian left Bobby at his father's bedside in the Recovery Room.

Soon after the surgery, Robert suffered a stroke. He grabbed his ankle and writhed in pain. Bobby alerted a nearby nurse, who responded with indifference and opined that "that was how deaf people communicate." Bobby disagreed, and she responded, "what do you know, you're a kid." Bobby raised a disturbance for two to five minutes until Dr. Sithian came back.

After removing Bobby from Robert's bedside and caring for Robert, Dr. Sithian told Josephine (through Bobby) that Robert had suffered a stroke and needed another operation. According to Bobby, interpreting was "amazingly overwhelming" and he had trouble because he did not "know what a stroke was."

Before Henderson left for the weekend, she advised a "charge nurse" that, if Robert was not discharged the following day (as expected), the charge nurse should call an ASL interpreter. Henderson gave the nurse the two telephone numbers that had not been disconnected. Henderson was unaware of Robert's stroke; the charge nurse never tried

9

calling any interpreter that afternoon or evening.

That night, Kristy stayed overnight in the Critical Care Unit ("CCU"), in order to translate for her parents. Kristy thus took over for Bobby, who testified that he was traumatized and apparently felt responsible for failing to help his father.

**B. Remainder of Hospital Stay**

The Loefflers maintain that, despite their constant requests in the following days, the Hospital never obtained an interpreter. Loeffler, 2007 WL 805802, at *2. According to Bobby, Hospital personnel would put off questions by saying "we're working on it or . . . I'm not the person you need to talk to." Josephine also claims she requested a TTY in order to avoid making extra car trips to the Hospital, but the request was denied. From October 27 to November 7, 1995, the family continued to rely on Kristy and Bobby, who stayed out of school to remain on duty as translators. Id. The Loefflers claim that the Hospital gave Kristy a pager so she could be "on call." Both Bobby and Kristy claim to have suffered depression as a result of their father's stroke, and the role they performed in relaying medical information. Id.

10

According to Henderson, she noticed Robert's name was still on the Hospital "census" the week after the surgery, made inquiry and was told by the charge nurse that "someone else" was there to interpret, and that the Loefflers "seemed fine." It is unclear whether the interpreter to whom the charge nurse was referring was Kristy, or someone else. At some point, Henderson spoke with her director, Nancy Ferrara, about the Loefflers' interpreter request.

On November 6, 1995, the Loefflers filed this lawsuit in the United States District Court for the Eastern District of New York claiming that the Hospital's failure to provide an interpreter violated the Americans with Disabilities Act ("ADA"), Pub. L. No. 101-336, 104 Stat. 327 (1990), codified as 42 U.S.C. §§ 12101-12213. The district court issued an order to show cause compelling the Hospital to provide a sign language interpreter. On November 8, 1995, the Hospital stipulated to all requested relief, and thereafter provided Robert with interpretive services for the duration of his stay. Loeffler, 2007 WL 805802, at *3. (Robert was finally discharged from the Hospital at some point in December 1995.)

Within two months of the Loeffler incident, the

11

Hospital amended its sign language interpreter policy. Id. According to Ann Marie McDonough, the Hospital's Associate Vice President for Rehabilitation Services, the staff is now "trained on how to identify patients who may need sign language interpreting or other communication services." Interpreters are now paid to be available during working hours and available by pager after hours. The Loefflers have visited the Hospital on multiple occasions since the policy was amended, and received interpretive services on all but one occasion. Id.

**C. Procedural history**

On February 14, 1996, the Loefflers, along with JoAnne Amore and Ann Rappoccio (relatives who joined in seeking the interpreter), filed a First Amended Complaint that included claims for injunctive relief under the ADA and the New York State Patients' Bill of Rights, 10 N.Y.C.R.R. § 405.7(a)(7); and monetary damages under the Rehabilitation Act of 1973 (the "RA"), Pub. L. No. 93-112, 87 Stat. 355, codified in relevant part at 29 U.S.C. §§ 794-794a; the New York State Human Rights Law ("State HRL"), N.Y. Exec. Law § 292; the New York City Human Rights Law ("City HRL"), N.Y.C. Admin. Code § 8-101 et seq.; and common law negligence. The

Loefflers also sought punitive damages.

After extensive discovery, the Hospital moved for partial summary judgment. By order dated February 27, 2007, the district court granted summary judgment to the Hospital on all claims except for Robert's and Josephine's common law negligence claims. The district court dismissed Robert's and Josephine's RA claims because, even though the Loefflers were entitled to a sign language interpreter, there was insufficient evidence for a reasonable jury to conclude that the Hospital acted with deliberate indifference. Loeffler, 2007 WL 805802, at *4-6. The district court determined that the Hospital "was aware that interpretive services might be required by certain patients," "had a system in place to provide such services when necessary," and "made numerous good-faith, though unfortunately unsuccessful, efforts to obtain an interpreter." Id. at *5-6. Treating Robert's and Josephine's State HRL and City HRL claims as coextensive with their federal claim, the district court dismissed these claims as well. Id. at *4, *6.

As to Kristy's and Bobby's claims, the district court ruled that the Hospital was not required to provide communication between Robert and his children because they

13

were not his next of kin.  Id. at *7.  And since Kristy and Bobby were not themselves denied any services to which they were entitled, they had no standing to assert an associational discrimination claim under the RA, or under City HRL, which, again, the district court construed as coextensive with federal law.[4]  Id. at *7-8.

In addition, the court denied the Loefflers' claims for injunctive relief under the ADA and the New York State Patients' Bill of Rights,[5] and declined to exercise supplemental jurisdiction over Robert's and Josephine's common law negligence claims.  Id. at *9, *11.

The Loefflers timely appealed.  They argue principally that: (1) they raised a genuine issue of material fact as to

---

[4] On October 4, 2004, Kristy and Bobby withdrew their claims based on common law negligence and the State HRL. Loeffler, 2007 WL 805802, at *3 n.3.

[5] The district court denied the Loefflers' claims for injunctive relief because they could not establish a "real and immediate threat," and the Hospital's policy amendments made it "almost certain that [Josephine] would receive adequate interpretive services [in the future]."  Loeffler, 2007 WL 805802, at *9-10.  (The Loefflers had withdrawn Robert's claims for injunctive relief when he died, after the First Amended Complaint was filed.)  The district court noted that the Hospital provided interpretive services to Robert after November 7, 1995 and to Josephine on all but one occasion she visited the Hospital.  On appeal, the Loefflers do not challenge the denial of injunctive relief.

14

the Hospital's deliberate indifference; (2) Kristy and Bobby have standing to assert associational discrimination claims under the RA; (3) the State HRL and City HRL should not be read co-extensively with their federal counterparts; and (4) the district court improperly declined to exercise supplemental jurisdiction over Robert's and Josephine's common law negligence claims.

**DISCUSSION**

We "review a district court's decision to grant summary judgment de novo, resolving all ambiguities and drawing all permissible factual inferences in favor of the party against whom summary judgment is sought."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks, citation, and brackets omitted); see also Fed. R. Civ. P. 56(c).

**I**

Under § 504 of the RA, "[n]o otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C.

§ 794(a). Under the RA's implementing regulations, a hospital that receives federal funds "shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care." 45 C.F.R. § 84.52(c). Additionally, a recipient hospital with fifteen or more employees is required to "provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." Id. § 84.52(d)(1). Thus the RA does not ensure equal medical treatment, but does require equal access to and equal participation in a patient's own treatment. See Alexander v. Choate, 469 U.S. 287, 301 (1985)(the RA requires that "an otherwise qualified handicapped individual must be provided with *meaningful access* to the benefit that the grantee offers")(emphasis added); Naiman v. N.Y. Univ., No. 95 Civ. 6469(LMM), 1997 WL 249970, at *2 (S.D.N.Y. May 13, 1997) ("[Plaintiff]'s claims relate to his exclusion from participation in his medical treatment, not the treatment itself."); Aikins v. St. Helena Hosp., 843 F. Supp. 1329, 1338 (N.D. Cal. 1994) (recognizing that resulting adequate medical treatment is not a defense

16

to a claim that defendant failed to provide effective communication under the RA).

To establish a prima facie violation of the RA, a plaintiff must show that one is: (1) a "handicapped person" as defined in the RA; (2) "otherwise qualified" to participate in the offered activity or to enjoy its benefits; (3) excluded from such participation or enjoyment solely by reason of his or her handicap; and (4) being denied participation in a program that receives federal financial assistance.  See Rothschild v. Grottenthaler, 907 F.2d 286, 289-90 (2d Cir. 1990).

A plaintiff aggrieved by a violation of the RA may seek all remedies available under Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), including monetary damages.  See 29 U.S.C. § 794a(a)(2).  However, monetary damages are recoverable only upon a showing of an intentional violation.  See Bartlett, 156 F.3d at 331 ("The law is well settled that intentional violations of Title VI, and thus the ADA and the Rehabilitation Act, can call for an award of money damages.").

The standard for intentional violations is "deliberate indifference to the strong likelihood [of] a violation:"

17

"[i]n the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will.  Rather, intentional discrimination may be inferred when a 'policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy . . . [or] custom.'"  Bartlett, 156 F.3d at 331 (internal citations omitted).  See also Duvall v. County of Kitsap, 260 F.3d 1124, 1138-39 & n.13 (9th Cir. 2001).

The parties here do not dispute that the Hospital is subject to the RA, or that Robert and Josephine Loeffler are "otherwise qualified" individuals with a disability.  The issue is whether the Hospital acted with "deliberate indifference" in failing to secure an interpreter for the Loefflers in the period from October 27 to November 7, 1995.

We have not defined "deliberate indifference" in this context.  In Gebser v. Lago Vista Indep. School Dist., 524 U.S. 274, 290-91 (1998), the Supreme Court interpreted "deliberate indifference" in the context of sexual harassment claims under Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq.  Nothing

18

suggests that the standard for damages under the RA is the same, but it is at least instructive that Gebser described the requirements of deliberate indifference as follows:

> [A]n official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

Id. at 290. In a separate context, we have also said that deliberate indifference must be a "deliberate choice . . . rather than negligence or bureaucratic inaction." Reynolds v. Giuliani, 506 F.3d 183, 193 (2d Cir. 2007)(citing Pembaur v. Cincinnati, 475 U.S. 469, 483-84 (1986)).

Here, the district court concluded that no reasonable jury could find that the Hospital acted with deliberate indifference. The district court conceded that the Hospital's "policy at the time of Robert's admission required improvement, [that] the Hospital's employees were perhaps negligent in failing to obtain an interpreter for" the Loefflers, and that the Loefflers "suffered through an emotionally difficult ordeal that was exacerbated by the Hospital's inadequate efforts to provide them with an interpreter." Loeffler, 2007 WL 805802, at *6. But the

19

district court conceived of the Hospital's failures as bureaucratic inaction: "the Hospital was aware that interpretive services might be required by certain patients," "had a system in place to provide such services when necessary," and its employees "made numerous good-faith, though unfortunately unsuccessful, efforts to obtain an interpreter." Id. at *5-6. The court was persuaded that Antoinette Henderson actually attempted to obtain an interpreter on October 27, and "undertook additional efforts to locate an interpreter for [the Loefflers] the following week." Id. at *6. Thus, the court concluded that "the record in this case, even when viewed in a light most favorable to Plaintiffs, cannot support a finding of deliberate indifference." Id.

We disagree. The record in this case can support a finding of deliberate indifference. To begin with, it is not clear that the district court construed all the facts in the light most favorable to the Loefflers. Most notably, the district court did not reference any of the Loefflers' alleged attempts to secure an interpreter prior to surgery, or their numerous attempts to secure one afterward. According to the Loefflers, they made at least four separate

20

attempts to secure an interpreter in the days and weeks leading up to October 27, all unheeded; and they made continual requests in the period from October 27 (the day of the surgery and the stroke) through November 7.  Further, the district court did not expressly consider the Loefflers' several requests for a TTY device, also unheeded.  Nor did the district court mention Bobby's testimony that Dr. Sithian "laughed off" Bobby's requests for an interpreter.

Considering this evidence, we conclude that a reasonable jury could conclude that persons at the Hospital had actual knowledge of discrimination against the Loefflers, had authority to correct the discrimination, and failed to respond adequately.  The Hospital may have had a general policy of providing interpreters, but Antoinette Henderson was unaware of any practice of scheduling an interpreter in advance, and her conduct may amount to indifference in the face of knowledge of Robert's need for an interpreter.  Perhaps most indicative, there is evidence that Dr. Sithian--arguably a policymaker--dismissed Bobby's demand for an interpreter, "just kind of laughed it off, and played it as a joke."  This evidence, taken together, would allow a jury to find deliberate indifference.

21

There are certainly facts in the record that might lead a reasonable jury to conclude that the Hospital was not deliberately indifferent. As the district court explained, the Hospital did have a policy in place to provide interpreters, and Antoinette Henderson made some efforts on the afternoon of October 27, 1995 to find an interpreter, and the law does not require her to have succeeded. But the testimony of the Loefflers and other family members, together with the obvious shortcomings in the policy and the Hospital's conduct, as well as the alleged apathetic response of Dr. Sithian, notwithstanding his authority to correct the discrimination, could lead a reasonable jury to conclude that the Hospital was deliberately indifferent; and its indifference to the Loefflers' rights may have been so pervasive as to amount to a choice.

**II**

The Loeffler children bring claims against the Hospital for associational discrimination--that the Hospital's failure to obtain an interpreter forced them to shoulder the burden of providing interpreter services, miss school, and suffer emotional distress as a result. The district court dismissed these claims on the ground that the Loeffler

22

children lacked statutory standing under the RA.

For the reasons set forth in the concurring opinion of Judge Wesley, a majority of this panel concludes that the children do have standing to bring associational discrimination claims under the RA, and therefore reverses the district court's dismissal. The opinion of Judge Wesley constitutes the opinion of the Court as to this issue. I dissent, and would affirm the district court's dismissal of the children's associational discrimination claims. My reasons are set forth in a separate, dissenting opinion.

**III**

The Loefflers brought additional claims against the Hospital under the State HRL and City HRL. Construing these statutes to be co-extensive with their federal counterparts, see, e.g., Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714-15 & n.6 (2d Cir. 1996); Stephens v. Shuttle Assocs., L.L.C., 547 F. Supp. 2d 269, 278 (S.D.N.Y. 2008), the district court dismissed each of these claims for the same reasons it dismissed the equivalent federal claims.[6]

---

[6] However, Kristy and Bobby withdrew their claims under the State HRL prior to the district court's order granting summary judgment. See Loeffler, 2007 WL 805802, at *3 n.3.

23

If the district court were correct, it would be enough to vacate the dismissal of the Loefflers' federal claims. And, indeed, we vacate the dismissal of Robert's and Josephine's State HRL claims for this reason.  But, we vacate the dismissal of the Loeffler's City HRL claims on the separate ground that the City HRL can no longer be read as co-extensive with federal law.

Under the City HRL, places of public accommodation are required to make reasonable accommodations for persons with disabilities, and may not "refuse, withhold from or deny to such [disabled] person any of the accommodations, advantages, facilities or privileges thereof."  N.Y.C. Admin. Code § 8-107(4)(a).  The City HRL also explicitly allows "associational discrimination" claims: "The provisions of this section set forth as unlawful discriminatory practices shall be construed to prohibit such discrimination against a person because of the actual or perceived . . . disability . . . of a person with whom such person has a known relationship or association."  N.Y.C. Admin. Code § 8-107(20).

City HRL claims have typically been treated as co-extensive with state and federal counterparts.  See, e.g.,

24

Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006) ("The standards for liability under these [state and city] laws are the same as those under the equivalent federal antidiscrimination laws."). However, the New York City Council has rejected such equivalence. The Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005) (the "Restoration Act") amended the City HRL in a variety of ways, including by confirming the legislative intent to abolish "parallelism" between the City HRL and federal and state anti-discrimination law:

> The provisions of this [] title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed.

Restoration Act § 7. There is now a one-way ratchet: "Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a *floor* below which the City's Human Rights law cannot fall." Id. § 1 (emphasis added).

25

In January 2009, the Appellate Division, First Department confirmed that claims under the City HRL must be reviewed independently from and "more liberally" than their federal and state counterparts:

> As a result of [the Restoration Act], the City HRL now explicitly requires an independent liberal construction analysis in all circumstances, even where state and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's "uniquely broad and remedial" purposes, which go beyond those of counterpart state or federal civil rights laws. . . . As New York's federal and state trial courts begin to recognize the need to take account of the Restoration Act, the application of the City HRL as amended by the Restoration Act must become the rule and not the exception. . . .
>
> [T]he Restoration Act notified courts that (a) they had to be aware that some provisions of the City HRL were textually distinct from its state and federal counterparts, (b) *all* provisions of the City HRL required independent construction to accomplish the law's uniquely broad purposes, and (c) cases that had failed to respect these differences were being legislatively overruled. ___

Williams v. N.Y. City Hous. Auth., 61 A.D.3d 62, 66-69, 872 N.Y.S.2d 27, 31 (1st Dep't 2009). See also Phillips v. City of New York, 884 N.Y.S.2d 369, 377 n.10 (1st Dep't July 28,

26

2009).

Because claims under the City HRL must be given "an independent liberal construction," Williams, 61 A.D.3d at 66, 872 N.Y.S.2d at 31, and because the City HRL permits associational discrimination claims, we vacate the dismissal of the Loefflers' City HRL claims and remand to the district court for further proceedings.[7] We leave it to the district court to interpret any specific, applicable provisions in the first instance.[8]

**IV**

Finally, the district court declined to exercise

---

[7] The Loefflers' submissions regarding the impact of the Restoration Act were deemed untimely in the district court. The Loefflers' opposition to the Hospital's motion for summary judgment, filed on October 4, 2005, did not reference the Restoration Act, which was enacted the day before. The Loefflers first raised the Restoration Act nine months later, in June 2006. Despite this "untimeliness," the district court reached the merits of the argument, and "considered the submissions of both parties on the issue." Loeffler, 2007 WL 805802, at *4 n.5. Because the district court reached the merits, we do the same. Moreover, since the Restoration Act *clarified* the meaning of the pre-existing protections under the City HRL, New York courts have applied the Restoration Act retroactively. See, e.g., Sorrenti v. City of New York, 17 Misc.3d 1102(A), at *4, 851 N.Y.S.2d 61 (Table) (Sup. Ct. N.Y. County Aug. 16, 2007).

[8] We note, without expressing an opinion, that amicus The Opportunity Agenda argues that the City HRL does not require "intentional" discrimination in order to obtain monetary damages. Opportunity Agenda Br. at 16.

27

supplemental jurisdiction over Robert's and Josephine's common law negligence claims because all federal claims had been dismissed. See 28 U.S.C. § 1367(c)(3).[9] Because we vacate the dismissal of Robert's and Josephine's federal claims, we also vacate that part of the order declining to exercise supplemental jurisdiction over Robert's and Josephine's common law negligence claims. See, e.g., Grandon v. Merrill Lynch & Co., Inc., 147 F.3d 184, 195 (2d Cir. 1998).

As the Loefflers do not challenge the dismissal of their claims for an injunction under the RA, the ADA, and the New York State Patients' Bill of Rights, any such arguments have been waived. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

**CONCLUSION**

For the foregoing reasons and the reasons set forth in Judge Wesley's opinion, the district court's order of

---

[9] Kristy's and Bobby's common law negligence claims were voluntarily withdrawn. See Loeffler, 2007 WL 805802, at *3 n.3.

28

February 27, 2007, is vacated and remanded in part for further proceedings consistent with this opinion.

Richard Wesley, Circuit Judge, concurring with Judge Sand.

I agree with my colleagues that there is a genuine issue of material fact as to whether Staten Island University Hospital (the "Hospital") acted with deliberate indifference towards Robert and Josephine Loeffler in failing to provide federally required sign language interpretation for the Loefflers while Robert was under the Hospital's care. Consequently, I concur in parts I and IV. I also agree with my colleagues' reading of New York City's Human Rights Law as it applies to Bobby and Kristy Loeffler and therefore concur as to part III.

I write to express the view of two members of the panel with regard to the children's claims under the Rehabilitation Act of 1973 (the "RA")[1] In our view, Bobby and Kristy – by virtue of being compelled to provide sign language interpretation, forced truancy from school, and involuntary exposure to their father's suffering – are "person[s] aggrieved" within the meaning of the RA and therefore have statutory standing.

As this Court and others have recognized, to gain entry

_____

[1] Pub. L. No. 93-112, 87 Stat. 355, *codified in relevant part at* 29 U.S.C. §§ 794-794a.

to the courts, non-disabled parties bringing associational discrimination claims need only prove an independent injury causally related to the denial of federally required services to the disabled persons with whom the non-disabled plaintiffs are associated. Bobby and Kristy make such claims because they were compelled to provide sign language interpretation for the Hospital and were consequently taken out of school and exposed to their father's suffering – injuries independent of their parents' injuries that were causally related to the Hospital's failure to provide sign language interpretation. Furthermore, even under a more restrictive reading of the RA, Bobby and Kristy have standing to bring suit because they were denied the benefits of adequate sign language interpretation services the Hospital was required to provide.

Under the RA, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

Federal regulation requires that the Hospital, *see* 28 C.F.R. § 36.104(6), "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities," 28 C.F.R. § 36.303(c); *see also* 45 C.F.R. § 84.52(c)-(d) (requiring that the Hospital "establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care").

"[A]ny person aggrieved by any act or failure to act by any recipient of Federal assistance" under the RA may bring suit. 29 U.S.C. § 794a(a)(2). This includes the non-disabled. In fact, "the use of such broad language in the enforcement provisions of the [RA] evinces a congressional intention to define standing to bring a private action under [the RA] . . . as broadly as is permitted by Article III of the Constitution." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (internal quotation marks omitted).

The standing provision of the RA, § 794a(a)(2), is distinct from the provision prohibiting discriminatory conduct on the part of the recipient of federal assistance,

§ 794(a).  Therefore, the type of injury a "person aggrieved" suffers need not be "exclu[sion] from the participation in, . . . deni[al of] the benefits of, or . . . subject[ion] to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  As we made clear in *Innovative*, we interpret the standing provision of the RA as broadly as possible under the Constitution, irrespective of § 794(a).  *See Innovative Health Sys.*, 117 F.3d at 47.  *Cf. Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) (interpreting the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(a)); *Clearing House Ass'n v. Cuomo*, 510 F.3d 105, 125 (2d Cir. 2007), *rev'd on other grounds, Cuomo v. Clearing House Ass'n, L.L.C.*, 129 S. Ct. 2710 (2009) (interpreting the Fair Housing Act).

This does not relieve the person aggrieved of establishing an injury causally related to, but separate and distinct from, a disabled person's injury under the statute.  Indeed, a failure to establish an injury and causation would create a constitutional standing issue, which, as we said in *Innovative*, is coterminous with statutory standing here.  *Innovative Health Sys.*, 117 F.3d at 47.  In our view, Bobby

and Kristy need only establish that each suffered an injury independent from their parents that was causally related to the Hospital's failure to provide services to their parents.

Bobby and Kristy – at least for standing purposes – have established three such injuries. First, Bobby and Kristy were forced to provide sign language interpretation. They were required to fill the gap left by the Hospital's failure to honor its obligations under the statute. Second, because they had to provide interpretation – and be on-call via pager twenty-four hours a day – they missed school. Third, because they were required to attend to their father in order to provide this service, they were needlessly and involuntarily exposed to their father's condition and thus unnecessarily placed at risk for emotional trauma because of their young age.[2] This is especially true for then-thirteen-year-old Bobby, who was forced to witness his father suffer a stroke and was then required to relay the doctor's assessment of his father's condition to his mother.

Bobby's and Kristy's claims are distinct from the

[2] Bobby testified that he attempted suicide and according to a psychiatric evaluation suffered from depression linked to his experience as Robert's interpreter during the 1995 surgery.

associational discrimination claims rejected by other courts. In *Popovich v. Cuyahoga County Court of Common Pleas, Domestic Relations Div.*, the court found that the plaintiff's alleged injury – being "deprived . . . of her father's companionship for a period of five years" – was not an injury under Title II of the Americans with Disabilities Act[3] (the "ADA") because she "ha[d] not been denied access to or participation in any of the public services covered by Title II [of the ADA]."[4] 150 F. App'x 424, 425, 427 (6th Cir. 2005). Bobby and Kristy do not claim that the Hospital's failure to provide a sign language interpreter injured them by preventing their father from coming home earlier or from providing care and support. Instead, they claim that they were forced to provide a service as a result of the Hospital's failure to honor its

---

[3] Pub. L. No. 101-336, 104 Stat. 327 (1990), *codified as* 42 U.S.C. §§ 12101 to 12213.

[4] Title II of the ADA confers "[t]he remedies, procedures, and rights set forth in [29 U.S.C. §] 794a . . . to any person alleging discrimination on the basis of disability" under 42 U.S.C. § 12132, which contains language nearly identical to § 794. 42 U.S.C. § 12133. For the sake of argument, I will assume that § 12133 confers the same associational discrimination rights to non-disabled litigants as § 794a(a)(2).

federally imposed obligation.

In *Simenson v. Hoffman*, the court held that the parents lacked standing to bring a claim under the ADA for associational discrimination, allegedly based on the discrimination by a doctor of the parents' disabled child, because the parents "were not at the medical center for any purpose other than to seek treatment for" their child. No. 95 C 1401, 1995 U.S. Dist. LEXIS 15777, at *16 (N.D. Ill. Oct. 24, 1995). In this case, however, Bobby and Kristy were at the Hospital for the additional purpose of attending their father and mother in order to provide services that the Hospital was required to provide. Absent the Hospital's failure to provide sign language interpreters – the alleged statutory violation at issue – Bobby likely would not have been present to witness his father have a stroke in the post-operating room, neither Bobby nor Kristy would have been responsible for translating medical terms to their mother that were beyond their comprehension, and neither Bobby nor Kristy would have been compelled to miss school in order to provide sign language interpretation. If Bobby and Kristy had not known sign language but instead had paid for

an interpreter to resolve the problem created by the Hospital's failure to meet their parents' needs would there be any question they would have a claim? What is different when two children are pressed into service by the Hospital?

In *Innovative*, we cited favorably the preamble to 28 C.F.R. § 35 which acknowledges that the regulation "'was intended to ensure that entities such as health care providers, employees of social service agencies, and others who provide professional services to persons with disabilities are not subjected to discrimination because of their professional association with persons with disabilities.'" 117 F.3d at 47 n.14 (quoting 28 C.F.R. pt. 35, app. A at 470) (emphasis omitted). We recognized that these regulations and their organic statutes are meant to protect professionals and healthcare entities from being discriminated against – i.e., injured – by virtue of their association with disabled persons. This injury need not necessarily be limited to an inability to provide services to disabled persons. We believe *United States v. City of Charlotte, N.C.*, 904 F. Supp. 482 (W.D.N.C. 1995), illustrates this. In that case, the court held that a

contractor had standing to sue under the RA for the City of Charlotte's refusal to permit the contractor to construct housing for people suffering from AIDS. *Id.* at 486. The court determined that the denial of the permit sufficiently injured the contractor by placing in jeopardy the contractor's ability to secure federal funding and "caused [the contractor] to incur additional construction costs and expenses." *Id.*

Bobby and Kristy have suffered injuries even more direct than those of the contractor. Indeed, it seems illogical that we would protect professions and healthcare entities from injuries due to their association with disabled persons but deny that protection to non-professional family members of disabled folks who are discriminated against because of a denial of services.[5]

---

[5] Some courts have gone even farther in finding an injury sufficient to bring an associational discrimination claim. In *Spector v. Norwegian Cruise Line Ltd.*, the court held that prospective non-disabled passengers of a cruise ship who intended to travel and room with disabled persons had standing to bring an associational discrimination claim under the ADA where the prospective non-disabled passengers were injured by "forc[ing] them to pay more to enjoy the privilege of staying in the same rooms with their [disabled] traveling companions." No. Civ.A. H-00-2649, 2002 WL 34100212, at *15 (S.D. Tex. Sept. 9, 2002), *rev'd and*

In this case, two children were required to provide a service to their parents that federal law says is guaranteed to any hearing impaired patient in a hospital.  Two children had to step in and do what the Hospital was unable or refused to do – at least until ordered to do so by a federal district court.

But even if Bobby and Kristy Loeffler were required under the RA to prove they were excluded from participation in, denied the benefit of, or discriminated against under a federally assisted program, they still have standing.  As stated above, federal regulation requires that the Hospital,

---

*remanded on other grounds*, 545 U.S. 119 (2005).  In *Niece v. Fitzner*, the court held that the plaintiff, a non-deaf prisoner, had stated a claim upon which relief could be granted where he alleged associational discrimination by the prison for not providing services for him to speak with his deaf fiancée.  922 F. Supp. 1208, 1216 (E.D. Mich. 1996).  In *Johanson v. Huizenga Holdings, Inc.*, the court, without finding an independent injury, held that the "father of the disabled minor does have standing to sue under the ADA by virtue of his relationship with his son, an individual with a known disability."  963 F. Supp. 1175, 1176 (S.D. Fla. 1997).

We need not go as far as these cases because Bobby and Kristy can demonstrate injuries more independent than those of the plaintiffs in *Niece* and *Johanson* and also more particular, acute, and overt than those in *Spector*.  They can point to particular services that they were forced to provide as a direct result of the Hospital's dereliction.

*see* 28 C.F.R. § 36.104(6), "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities," 28 C.F.R. § 36.303(c).  The Hospital failed to provide sign language interpreters and consequently relied on Bobby and Kristy – thirteen and seventeen years old at the time, respectively – to translate between the Hospital staff and Robert and Josephine.  As Bobby testified, the Hospital relied on the children to translate complicated medical terms that the children were not capable of understanding.  In other words, the children were – by their own admission – incompetent to provide adequate sign language interpretation to translate these terms between the parties or for themselves.  As a result, they and their mother were denied the service of adequate sign language interpretation to understand their father's medical complications and the procedures he underwent.[6]

There are, of course, issues of fact in this case.

---

[6] If Bobby and Kristy had to prove that they were denied services that should have been provided to a qualified disabled person under the RA, that view would effectively eviscerate any right to an associational discrimination claim under the RA and overturn *Innovative.*

There is dispute as to whether the children were forced to translate for the hospital, for example, or whether the requests for interpreters were properly made.  We are sending the case to trial to resolve such disputes.  But these issues go to the extent of the injury suffered and the calculation of damages, not whether or not the statute itself affords them the right to claim that injury.  A trial in this case will center on whether rights were violated, not if those rights exist.  Once we have decided that they fall within the purview of this statute, it is then up to the jury to decide if they believe the children's story.

Finally, a word or two is in order with regard to the concerns expressed by our dissenting colleague. The dissent expresses the view that our determination that Bobby and Kristy are "person[s] aggrieved" within the meaning of the RA will open the courts to all manner of claims by friends and relatives of disabled persons "provid[ing] additional or *complementary* services to patients" such as "[a] friend lift[ing] a wheelchair up a few stairs when there is no ramp," "a relative prepar[ing] a gluten-free meal that a hospital lacks resources to provide," "a sister stay[ing] up

all night to cheer the patient and translate from Dutch as needed, and suffer[ing] the trauma of a flatlining." (emphasis added).

By grouping Bobby's and Kristy's claims with these examples the dissent seriously misrepresents the children's claims. While the dissent's hypothetical list of horrors may have some simplistic appeal it has no real correlation to the injuries presented here. Two children were required to provide a service to their parents that federal law says is guaranteed to any hearing impaired patient in a hospital. Two children did what the Hospital was unable or refused to do – at least until ordered to do so by a federal district court. Two children were forced to explain to their hearing impaired mother why their father was near death in terms they did not or could not understand. If our dissenting brother thinks that what Bobby and Kristy were forced to do is a "complementary service" – his phrase not ours – then our colleague is sadly mistaken. We see this case as materially different in kind. It is not the dawn of never-ending liability for the Hospital, it is what Congress required – a link to the hearing world.

Accordingly, we reverse as to Bobby's and Kristy's claims and remand them to the district court for further proceedings in accordance with this decision.

Dennis Jacobs, Chief Judge, dissenting in part:

I respectfully dissent as to the statutory standing of Kristy and Bobby Loeffler to bring associational discrimination claims against the Hospital under the Rehabilitation Act of 1973 ("RA").

The RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, [i] be *excluded from the participation in*, [ii] be *denied the benefits of*, or [iii] be *subjected to discrimination under* any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a) (emphases added).  The next section provides a private right of action: "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."  29 U.S.C. § 794a(a)(2).

The majority reads the phrase "any person aggrieved" in § 794a(a)(2) to mean that an RA associational claim may be pled even by someone who is not herself "excluded from []

1

participation in" or "denied the benefits of" anything that the RA guarantees.[1]  As I undertake to demonstrate in four Points, the majority is expanding the RA in a way that is unsupported by precedent (I), text (II), logic (III), and prudence (IV).

I

Federal courts have long recognized that the phrase "any person aggrieved" supports claims for "associational discrimination" under the RA.  In the first such case, a woman (not disabled) sued an airline that had refused to board her disabled husband, with whom she was traveling.

---

[1]  In passing, the majority suggests that the children themselves may have been denied a service guaranteed under the RA because they were denied a translator.  But this is surely odd, because, as persons with normal hearing, they needed no translator--which is of course the whole premise of their claim.

The majority opinion tweaks the argument by saying they were denied "*adequate* sign language interpretation" because they had to translate "complicated medical terms" that they did not understand. (emphasis added).  But that deprivation comes down to a single medical term ("stroke").  See infra at n.7.  Certainly the children cannot contend that *they* needed a superior translator at bedside to explain their father's condition since [i] with normal hearing, they did not need ASL to communicate with the doctor, [ii] if they did not understand "stroke" when it was spoken, they would not have understood it when it was translated in ASL by someone who did, and [iii] their main point is that they would not have been with their father in the hospital if any other translator had been present.

2

*Nodleman v. Aero Mexico*, 528 F. Supp. 475, 479-80 (C.D. Cal. 1981). The court declined to dismiss her associational claim because the RA's "use of the phrase 'any person aggrieved' . . . evinces a congressional intention to define standing to bring a private action under Section 504 as broadly as is permitted by Article III of the Constitution." *Id.* at 485.

We recognized standing to assert a claim for associational discrimination under the RA in *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 46–48 (2d Cir. 1997). An addiction rehabilitation center challenged the denial of a zoning permit, alleging that the city was discriminating against the center's patients. *Id.* at 47. We relied particularly on *Nodleman*, and the "broad language" of the RA's enforcement provision. *Id.*

The scope of the term "any person aggrieved" is not apparent from the text of the RA itself, but it cannot be altogether limitless. Crucially, in both *Nodleman* and *Innovative Health Sys.*, the plaintiffs themselves were excluded from participation in a program, or were denied services, or were discriminated against (albeit on the basis of their association with disabled persons). The plaintiffs

3

in these cases were not "otherwise qualified individual[s] with a disability[,]" but the wife (excluded from the plane) and the rehabilitation center (denied a permit) were aggrieved in the same manner and for the same reasons as an "otherwise qualified individual with a disability" under § 794(a): they were "excluded from the participation in, [] denied the benefits of, or [] subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

The decisive distinction in our case is that the Loeffler children were never excluded from participation, denied services, or subjected to discrimination. They assisted their parents in coping with an alleged violation of the RA without themselves being denied services. They may well have been injured, forced to interpret for their parents, and made to miss school (among other injuries), but the RA does not confer standing on account of these types of injuries.

A survey of cases under the ADA shows that courts have generally adhered to this distinction (implicitly or explicitly), and conferred standing as a "person aggrieved" only in cases where a plaintiff has actually been excluded,

4

denied, or subjected to discrimination in the receipt of services.  For instance, in Popovich v. Cuyahoga County Court of Common Pleas, Domestic Relations Div., 150 F. App'x 424, 427 (6th Cir. 2005)(per curiam), a daughter who was the subject of custody proceedings (brought by her disabled father) sued an Ohio court, alleging that the court's failure to accommodate her father's disability caused delays that deprived her of her father's companionship for five years.  The Sixth Circuit rejected her claim: "Unlike the treatment centers in Innovative Health Sys. and MX Group, both of which were denied permits to operate, Lauren Popovich has not been denied access to or participation in any of the public services covered by Title II."  Id. at 427.  She may have been aggrieved, but she was not denied services.

Similarly, in Simenson v. Hoffman, No. 95 C 1401, 1995 WL 631804, at *2 (N.D. Ill. Oct. 24, 1995), a doctor refused to treat a disabled child, and screamed at the parents to get out of his office.  The district court dismissed the parents' claim for associational discrimination on the ground that the parents were not denied services: "denial of admission to a movie theater or a hotel constitutes a

5

separate injury because the companion is denied the use of the service or facility.  The [parents] were not at the medical center for any purpose other than to seek treatment for [the child].  [The child's] ejection, and that of his parents, was merely the final act in the decision to deny [the child] medical treatment."  1995 WL 631804, at *6.  See also Glass v. Hillsboro School Dist. 1J, 142 F. Supp. 2d 1286, 1292 (D. Or. 2001) (noting that to prevail on a theory of associational discrimination, the plaintiffs "must allege and prove that *they . . . were discriminated against in obtaining those services* solely because they were associated with disabled individuals") (emphasis added).

**II**

The plain text of the RA--"any person aggrieved" (§ 794a(a)(2))--is expansive, and the majority's reading might be defensible but for a subsequent indication of congressional intent.

We know that Congress meant to incorporate certain "standards" and judicial interpretations of the RA into the later-adopted Americans with Disabilities Act of 1990, ("ADA"), 42 U.S.C. §§ 12101-12213.  See, e.g., 42 U.S.C. § 12201(a); H.R. Rep. No. 101-485, at 84 (1990), as reprinted

6

in 1990 U.S.C.C.A.N. 267, 367; Collings v. Longview Fibre Co., 63 F.3d 828, 832 n.3 (9th Cir. 1995) (noting that "Congress intended judicial interpretation of the Rehabilitation Act be incorporated by reference when interpreting the ADA"); McDonald v. Commonwealth of Pa., Dep't of Pub. Welfare, 62 F.3d 92, 95 (3d Cir. 1995) ("Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same.").[2] When Congress enacted the ADA, it thus clarified the standing requirement that associated persons be themselves actually excluded or denied, and thereby unambiguously limited the breadth of "any person aggrieved."

For example, Title I of the ADA (concerning employment discrimination against qualified individuals with a disability), prohibits employers from "*[e]xcluding* or otherwise *denying* equal jobs or benefits to a qualified individual because of the known disability of an individual

---

[2] After passage of the ADA, the RA was amended in part to codify the congruence. See, e.g., 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990.").

7

with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4) (emphases added).  An associated person has a claim only if she herself suffers an actual adverse employment action. See generally Den Hartog v. Wasatch Acad., 129 F.3d 1076, 1085 (10th Cir. 1997) (plaintiff alleging that he was fired due to son's disability must allege that he himself was "subjected to adverse employment action"); Larimer v. Int'l Bus. Machines Corp., 370 F.3d 698, 700–02 (7th Cir. 2004) (same).

Title II of the ADA (concerning public entities and public transportation) contains no express associational discrimination provision,[3] but its implementing regulations provide: "A public entity shall not *exclude* or otherwise *deny* equal services, programs, or activities to an individual or entity because of the known disability of an

_____

[3] We nevertheless held in Innovative Health Sys. that Title II supports claims for associational discrimination. See 117 F.3d at 47 ("According to the [defendant], because Title II does not contain similar language, Congress intended to prevent standing based on association under this section.  Although courts generally should be reluctant to conclude that the omission of language in one part of a statute that is included in another is unintentional, . . . there is extensive support in this instance to read the specific examples of discrimination from the other two titles into Title II.").

8

individual with whom the individual or entity is known to have a relationship or association."  28 C.F.R. § 35.130(g) (emphases added).[4]

Title III of the ADA (concerning public accommodation) prohibits discriminatory conduct against associated persons thus: "It shall be discriminatory to *exclude* or otherwise *deny* equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."  42 U.S.C. § 12182(b)(1)(E) (emphases added).

Each of these ADA provisions imposes an unambiguous statutory standing requirement that an associated person be actually excluded or denied due to their association.

The evidence suggests that Congress interpreted the RA the same way.  Under the ADA's general rule of construction,

---

[4] As noted in <u>Innovative Health Sys.</u>, the preamble to 28 C.F.R. § 35.130(g) explains: "This provision was intended to ensure that entities such as health care providers, employees of social service agencies, and others who provide professional services to persons with disabilities *are not subjected to discrimination* because of their professional association with persons with disabilities."  28 C.F.R. pt. 35, app. A at 470 (emphasis added).

"nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973." 42 U.S.C. § 12201(a).[5] If "standard" is construed broadly, as it is evidently used and intended, it subsumes statutory standing. It then follows ineluctably that Congress understood its ADA wording to be congruent with the proper construction of its earlier language in the RA.

Reading the RA and ADA together, as Congress clearly intended us to do, associational claims require an exclusion or denial of services.

**III**

The majority's wide interpretation of "any person aggrieved" has no evident limiting principle, as can be illustrated in the hospital context. Relatives and friends of patients routinely provide additional or complementary services to patients. Once a breach of duty is found under the RA, everybody and his mother (literally) will be able to submit a bill for services and injuries. A friend lifts a

---

[5] The legislative history of § 12201 explains: "This section explains the relationship between section 504 of the Rehabilitation Act of 1973 and [the Americans with Disabilities] Act." H.R. Rep. No. 101-485, at 44 (1990), as reprinted in 1990 U.S.C.C.A.N. 267, 288.

wheelchair up a few stairs when there is no ramp, and is injured; a relative prepares a gluten-free meal that a hospital lacks resources to provide, and thereby incurs expense, or gets burned on the stove; a sister stays up all night to cheer the patient and translate from Dutch as needed, and suffers the trauma of a flatlining.

If the RA supported all these claims flowing from an initial act of discrimination, a hospital's liability would never end. And the hospital might have to pay twice or many times over for each service it failed to afford.[6] If this were the law, the RA would in that respect grant more extensive remedies to associated persons than to persons with disabilities themselves: only the disabled would

---

[6] The central purpose of the anti-discrimination statutes is to deter discrimination before it occurs--not necessarily to provide full and adequate compensation for harms that are at best tangentially related to the deprivation suffered by a person with disabilities. The preamble to the Americans with Disabilities Act states: "It is the purpose of this chapter[] to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). If the goal were to yield compensation, the recovery of money damages would not be conditioned on proof of *intentional* discrimination. See Bartlett v. N.Y. State Bd. of Law Exam'rs, 156 F.3d 321, 331 (2d Cir. 1998) (under the RA and ADA, monetary damages are recoverable only upon a showing of an intentional violation), vacated on other grounds and remanded, 527 U.S. 1031 (1999).

11

actually have to be excluded, denied, or subjected to discrimination in order to recover damages.

## IV

Claims of the kind that the majority opinion recognizes create intractable administrative problems for judges and juries. The Loeffler son alleges that he was injured because he was drafted into service as an interpreter,[7] that he was forced to miss school to be present at the hospital, and that because he was in the recovery room (after the doctor had left and translation duty ended) he was present when his father had a stroke. But the young man would in any event have run the risk of being present when his father had a stroke--unless he claims that he would not have visited the hospital at all as his father lay dying. Moreover, I do not see how, in showing injury or calculating damages, the trauma of translating at the hospital can be teased apart from the overarching and subsuming trauma of having a father who was dying over time from a heart condition and a stroke. Difficulties of this nature may be

---

[7] He claims he suffered stress because he could not think of the sign for "stroke" when he was translating the doctor's diagnosis for his mother. No doubt, the situation was inherently stressful, but the incremental stress could have been alleviated by use of a pad and pencil.

12

one reason why this case, originally filed in 1995, is still in progress, with no prospect of resolution.

\* \* \*

For these reasons, I conclude that the district court properly dismissed the children's claims for associational discrimination under the RA. In any event, the majority opinion does not prejudge the analogous question under the ADA.

13