**Judith CERRATO, Plaintiff,**

v.

**SOLOMON & SOLOMON, Defendant.**

**Civil Action No. 3:11–cv–623 (JCH).**

United States District Court,
D. Connecticut.

Dec. 18, 2012.

Sergei Lemberg, Lemberg & Associates, LLC, Stamford, CT, for Plaintiff.

Charlene M. Russo, Law Office of Charlene Russo, Glastonbury, CT, Cristin E. Sheehan, James L. Brawley, Morrison, Mahoney LLP, Hartford, CT, for Defendant.

**RULING RE: DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. NO. 66) AND PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. NO. 71)**

JANET C. HALL, District Judge.

## I. INTRODUCTION

Plaintiff Judith Cerrato ("Cerrato") brings this action against defendant Solomon & Solomon ("Solomon") for violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692c ("FDCPA"), and for Connecticut state law invasion of privacy by intrusion upon seclusion.

## II. STATEMENT OF FACTS

### A. *The Debts*

Cerrato incurred a financial obligation to Citibank, which was referred to Solomon for collection on August 4, 2010.[1] Plaintiff's Local Rule 56(a)(2) Statement (Doc. No.) ¶ 1–2. Solomon assigned account number 23234679 ("account 79") to that file. *Id.* at ¶ 2. Citibank previously referred two other files to Solomon involving debts incurred by Cerrato. *Id.* at ¶ 3. Those files were assigned numbers 21288258 ("account 58") and 22325563 ("account 63"), and were received for collection on November 7, 2008, and August 31, 2009, respectively. *Id;* Defendant's Local Rule 56(a)(2) Statement (Doc. No. 84) at ¶ 4–5. Account 58 went into suit on or before September 21, 2009. Def.'s L.R. 56(a)(2)

---

1. Cerrato's Local Rule 56(a)(1) statement claims Solomon received the file on August 5, 2010. Pl. L.R. 56(a)(1) at ¶ 6. However, she admits in her Local Rule 56(a)(2) statement that Solomon received the file on August 4, 2010. Pl. L.R. 56(a)(2) at ¶ 2.

at ¶ 4. Account 63 went into suit on or before March 2, 2010. *Id.* at ¶ 5. Account 79 went into suit on or before January 1, 2011.[2] *Id.* at ¶ 6.

Solomon began calling Cerrato on account 58 in 2009. *Id.* at ¶ 7. Cerrato sent a cease and desist letter on September 12, 2009, on account 58.[3] *Id.* at ¶ 8. Solomon received the cease and desist letter on September 12, 2009. *Id.* at ¶ 9. Despite receiving the notice, Solomon made six more calls to Cerrato before stopping on September 22, 2009. *Id.* at ¶ 10. In August 2010, Solomon began calling Cerrato again, this time in reference to account 79. *Id.* at ¶ 11. Between August 16, 2010, and February 2, 2011, Solomon called Cerrato 117 times. *Id.* at ¶ 12.

On February 3, 2011, Cerrato faxed Solomon a notice demanding that it stop calling. *Id.* at ¶ 13. The four page letter stated that it was "[r]egarding all alleged Citibank Accounts" and included a copy of the September 9, 2009 letter. *Id.* at ¶ 14. The February fax also stated: "[t]he following is a copy of the fax sent on 09–12–2009 and also a new NOTICE TO CEASE COMMUNICATION." *Id.*

On February 4, 2010, Tina Collins, an administrative support clerk at Solomon, processed the cease and desist letter from Cerrato.[4] Def.'s L.R. 56(a)(2) at ¶ 16. Ms. Collins noted that Solomon should cease and desist communication for account 92,

but not the other Citibank accounts. Def.'s L.R. 56(a)(2) at ¶ 21. According to Cerrato, Ms. Collins noted only account 92 because it was the only account number listed on the letter. Pl. L.R. 56(a)(2) at ¶ 21.

After receiving the letter, between February 4, 2011 and March 8, 2011, Solomon called Cerrato eight times. Def.'s L.R. 56(a)(2) at ¶ 24. According to Solomon, it utilizes an automatic dialer for outgoing calls to reach customers. A computer generated call log keeps track of all calls. If the consumer answers the telephone, the automatic dialer routes the call to a collection representative. If the call is not answered, and is instead forwarded to an answering machine or voicemail box, the call is terminated by the automatic dialer and recorded in the log as an "attempt." Def.'s L.R. 56(a)(1) at ¶ 8. According to Solomon, the eight telephone calls made to Cerrato between February 4, and March 8, were listed as "attempts" on the Solomon call logs, and therefore, no Solomon representative spoke to Cerrato. *Id.* at ¶ 9. However, according to Cerrato, each time Solomon called, its name appeared in the caller identification display of Cerrato's phone. Pl. L.R. 56(a)(1) at ¶ 25. Cerrato knew that Solomon was calling her and that the calls were about a debt, as they had been for the past several years.[5] *Id.*

---

2. Cerrato cites to the docket sheets for all three suits, which reflect the date the summons and complaint were filed in each case. *See* Pl. L.R. 56(a)(1) at ¶ 4–6. Solomon claims that the docket sheets do not reflect the date of service in those cases. *See* Def.'s L.R. 56(a)(2) at ¶ 4–6. *See Rocco v. Garrison,* 268 Conn. 541, 549, 848 A.2d 352 (2004) (stating that, "under the law of our state, 'an action is commenced not when the writ is returned but when it is served upon the defendant' ") (citing *Broderick v. Jackman,* 167 Conn. 96, 99, 355 A.2d 234 (1974)).

3. According to Solomon, the letter also referenced account 63, *see* Def.'s L.R. 56(a)(2) at ¶ 8, however, the court cannot find where the document says so. *See* Cerrato Aff., Ex. C.

4. Initially in this litigation, Solomon denied ever receiving the February fax. Def.'s L.R. 56(a)(2) at ¶ 28.

5. Solomon sets forth in its L.R. 56(a)(1) statement the process by which Solomon initiates a telephone call through the automatic dialer. Def.'s L.R. 56(a)(1) at ¶ 8. Although agreeing "with the remainder of paragraph 8," Solo-

On March 8, 2011, Solomon collector Nicole Esposito called Cerrato about account 79, but Cerrato did not answer. Def.'s L.R. 56(a)(2) at ¶ 26. Ms. Esposito noticed that the February 2, 2011 cease and desist letter had not been applied to account 79. Pl. L.R. 56(a)(2) at ¶ 11. As such, Ms. Esposito followed Solomon's practices and procedures to avoid contact with debtors after receiving a notice to cease and desist.[6] Def. L.R. 56(a)(1) at ¶ 11. After Ms. Esposito took such action, the calls ceased. Pl. L.R. 56(a)(2) at ¶ 11.

B. *Processing Cease and Desist Letters*

Solomon designed practices and procedures to avoid violations of the FDCPA, 15 U.S.C. § 1692c. Its employees are trained about the import of a debtor's request that Solomon cease communications regarding the debt and the manner in which the FDCPA and Solomon protect the debtor's rights following such requests. Pl. 56(a)(2) at ¶ 12. New hires receive in-depth training as to the rules and requirements of the FDCPA as a whole. Thereafter, Solomon provides quarterly training and, depending upon the employee's function, either quarterly or periodic testing with respect to the FDCPA. *Id.* at ¶ 13. If a seminar, new decision, or simply a question posed by an employee, arises in between quarterly training, an email advising of any changes in the law, or Solomon's practices and procedures with respect to the same, is distributed as an update to Solomon's staff. *Id.* at ¶ 14. According to Solomon, in order to avoid violations of the FDCPA's provision preventing debt collectors from contacting debtors, Solomon's training and testing materials specifically instruct employees as to the meaning and import of a cease and desist letter. Def.'s L.R. 56(a)(1) at ¶ 15. Cerrato contests this claim because Solomon's testing and literature merely states that employees are allowed to contact a debtor one more time after receiving a cease and desist letter. Pl. L.R. 56(a)(2) at ¶ 15.

Solomon's computer system was designed to include protections to honor cease and desist communications and to avoid violations of the FDCPA. In this regard, Solomon uses a specific code, "ONTC," to indicate that a debtor has sent a cease and desist letter requesting no further contact with respect to the debt. The ONTC code means to stop action on the account. Pl. 56(a)(2) at ¶ 16. According to Solomon, when a cease and desist letter is received, Solomon's employees are trained to docket the notice and place the "ONTC" code on the account. Def.'s 56(a)(1) at ¶ 16. However, Cerrato claims that employees are not trained to note the

mon disagrees in that "each time Solomon called Cerrato it included its name in the caller identification display." Pl. L.R. 56(a)(1) at ¶ 8. The same back and forth is evidenced in Cerrato's L.R. 56(a)(1) statement whereby she claims Solomon's name appeared in her caller ID, and in Solomon's denial in its L.R. 56(a)(2) statement, which references the same colloquy about the automatic dialer system. *See* Pl. L.R. 56(a)(1) at ¶ 25; Def.'s L.R. 56(a)(2) at ¶ 25. The court does not see how these assertions are responsive to one another unless Solomon is claiming that the automatic dialer calls from an outside line could not reflect Solomon's name on a caller ID display. However, if that is what Solomon is claiming, there is no evidence before the court that supports that position.

6. Although Cerrato disagrees "with any suggestion or inference that Solomon's training, practices or procedures were reasonable [sic] adapted to ensure Cerrato's Notice was correctly logged in the first instance," she does not cite anywhere in the record to support her denial, Pl. L.R. 56(a)(2) at ¶ 11. Thus, the statement is admitted. L.R. 56; *see also Eiden v. McCarthy*, 531 F.Supp.2d 333, 338 (D.Conn.2008).

"ONTC" code on all accounts when a cease and desist letter is received. Pl. 56(a)(2) at ¶ 16.

Ms. Collins, who processed Cerrato's cease and desist letter, has worked at Solomon since approximately 2008. Pl. 56(a)(2) at ¶ 17. According to Solomon, Ms. Collins received training with regard to Solomon's policies for preventing FDCPA violations, and specifically, the import of a cease and desist request as well as the proper method for coding such requests. Def.'s 56(a)(1) at ¶ 17. Cerrato contests this claim because Ms. Collins' testing only pertained to whether she was allowed to contact a debtor one more time after receiving a cease and desist letter. Pl. 56(a)(1) at ¶ 17.

According to Cerrato, when Ms. Collins receives a cease and desist letter, she first looks for an account number. Pl. L.R. 56(a)(1) at ¶ 17. Both parties agree that if there is no account number listed on the letter, Ms. Collins looks up the debtor's name and notes the accounts accordingly. *Id.* at ¶ 18. However, according to Cerrato, if there is an account number, and even if the notice references multiple accounts, Ms. Collins notes the cease and desist only for the specific account referenced if the debtor requests that communication is stopped as to "this debt." *See id.* at ¶ 19; Pl. Mot. Summ. J., Ex. B, at 13–14. According to Cerrato, Ms. Collins assumes that "some of it's tricked" when debtors say they have multiple accounts, but only reference a singular debt. *See* Pl. Mot. Summ. J., Ex. B, at 16. However, Solomon contests these claims because Ms. Collins has also asserted that she searches the computer system to see if the debtor has other accounts if they specifically say they have other accounts. Def.'s L.R. 56(a)(2) at ¶ 19; Collins Aff. at 13.

According to Cerrato, Ms. Collins believed how she processed the letter was correct until she was informed that she made a mistake in February 2012. Pl. L.R. 56(a)(1) at ¶ 22–23. According to Solomon, Ms. Collins admitted that she made a mistake. Def.'s L.R. 56(a)(2) at ¶ 22–23.

## III. STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir.2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Id.* In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 274 (2d Cir.2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir.2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.2009) (quoting Fed.R.Civ.P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir.2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir.2007)); *see also Havey v. Homebound Mortg., Inc.*, 547 F.3d 158, 163 (2d Cir.2008) (citing *Anderson v. Lib-*

**144**

*erty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

## IV. DISCUSSION

Solomon moves for summary judgment on Cerrato's FDCPA claim, arguing that Cerrato's claim fails as a matter of law because the eight unanswered telephone calls do not constitute "communications" under the FDCPA, and as such, Solomon cannot be held liable for communicating with a debtor after receiving a cease and desist letter. 15 U.S.C. § 1692c(c). Solomon also argues that, even if the unanswered telephone calls constitute communications, the bona fide error defense obviates liability. Cerrato cross-moved for summary judgment, claiming that the undisputed facts show Solomon violated the FDCPA and that such violation was not the result of a bona fide error.[7]

### A. Whether an unanswered telephone call constitutes a "communication" under 15 U.S.C. § 1692c

The FDCPA is aimed at eliminating the use of "abusive, deceptive, and unfair debt collection practices by ... debt collectors." 15 U.S.C. § 1692(a). Section 1692c prohibits communication with the consumer with respect to a debt once "a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication

with the consumer." 15 U.S.C. § 1692c(c). A debt collector may contact a consumer after receiving a cease and desist letter "(1) to notify the consumer that the debt collector's further efforts are being terminated; (2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or (3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy if such notice from the consumer is made by mail, notification shall be complete upon receipt." *Id.*

Solomon argues that it cannot be liable for breaching section 1692c because it never communicated with Cerrato after it received her February 2, 2011 fax requesting that Solomon stop calling on all Citibank accounts. "The term 'communication' means the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). Solomon argues that an unanswered telephone call does not constitute a communication because no information was conveyed; Cerrato never spoke to a Solomon representative. Def. Mem. in Supp. Mot. for Summ. J. at 9.

No court within the Second Circuit has answered the question of whether an unanswered or missed telephone call can constitute a communication under the FDCPA. Solomon relies on a District of Oregon case in which the court held that an uncompleted telephone call alone does not constitute a communication under the FDCPA.[8] *See Wilfong v. Persolve, LLC,*

---

**7.** Neither party moved for summary judgment on Cerrato's state law claim for invasion of privacy by intrusion upon seclusion. Therefore, the court does not consider that claim on summary judgment.

**8.** Solomon also relies in its Reply on *Zortman v. J.C. Christensen & Associates, Inc.,* 870 F.Supp.2d 694 (D.Minn.2012). In *Zortman,* the court considered whether a voice message on a consumer's cell phone constituted a third party communication in violation of Section 1692c(b). *Zortman,* 870 F.Supp.2d at

2011 WL 2678925 (D.Or. June 2, 2011) (unpublished opinion). The Wilfong decision is not binding on this court, but regardless, it is distinguishable from the case at hand. In Wilfong, the consumer received one unanswered telephone call after she sent a cease and desist letter to the defendant debt collector. See id. at *1. There was no evidence before the court that the debt collector had previously contacted the consumer by telephone. Id. In addition, the consumer did not know definitively who was calling her; rather, she believed the telephone number was that of the debt collector's attorney. Id.

In contrast, Cerrato received eight unanswered telephone calls from Solomon. See Def.'s L.R. 56(a)(2) at ¶ 24. She claims that Solomon's name appeared on her caller ID display, thereby confirming that a debt collector was contacting her. Pl. L.R. 56(a)(1) at ¶ 25. In addition, Solomon had previously called Cerrato 117 times regarding her debts. Def.'s L.R. 56(a)(2) at ¶ 12. The telephone number that appeared on her telephone screen after she sent her February cease and desist letter was the same telephone number listed on the previous calls from Solomon. See Pl. Mot. Summ. J., Cerrato Aff., Ex. B.

Without Second Circuit case law on point, the court looks to Second Circuit case law that considers the meaning of "communication" under the FDCPA. In Foti v. NCO Financial Systems, Inc., 424 F.Supp.2d 643 (S.D.N.Y.2006), the court held that a prerecorded voice message that did not specifically reference a debt still constituted a communication under the FDCPA. The court's reasoning is instructive. First, the court clarified that "con-

sistent with Congress' intent in enacting the FDCPA, the statute [including the meaning of the word "communication"] should be construed broadly." Foti, 424 F.Supp.2d at 655 (quoting Pipiles v. Credit Bureau of Lockport, Inc., 886 F.2d 22, 27 (2d Cir.1989)). As the statute is intended to protect consumers and prevent abusive practices, the statute must be liberally construed in favor of consumers. Id. (citing Blair v. Sherman Acquisition, no. 04 Civ. 4718, 2004 WL 2870080, at *2 (N.D.Ill. Dec. 13, 2004)).

Second, the court noted that the message indicated that the call was from "NCO Financial Systems." According to the court, anyone familiar with NCO Financial Systems would know that it is a debt collector and that, therefore, the call was about a debt, even though the call did not specifically reference a debt.[9] Foti, 424 F.Supp.2d at 658. Similarly, anyone familiar with Solomon's name and telephone number, as displayed on Cerrato's caller ID display, would know that it is a debt collector. Furthermore, while in Foti, the plaintiff received one telephone message, after only one prior letter communication from the defendant, Foti, 424 F.Supp.2d at 647–48, Cerrato received 117 calls from Solomon prior to the eight unanswered telephone calls. Def.'s L.R. 56(a)(2) at ¶ 12. If Foti was on notice as to NCO Financial Systems' debt collection business, Cerrato was as well.

Third, the Foti court emphasized the fact that "the obvious purpose of the message was to provide the debtor with enough information to entice a return call." Id. at 656; see also Hosseinzadeh v.

---

695–96. Any reference to whether an unanswered telephone call constitutes "communication" under the Act is mere dicta.

9. The pre-recorded message said: "Good day, we are calling from NCO Financial Systems regarding a personal business matter that requires your immediate attention. Please call back 1–866–701–1275 once again please call back, toll free, 1–866–701–1275, this is not a solicitation." Foti, 424 F.Supp.2d at 648.

*M.R.S. Assocs., Inc.*, 387 F.Supp.2d 1104, 1116 (C.D.Cal.2005) (stating that the voice-mails "were merely the first step in a process designed to communicate with plaintiff about her alleged debt"). In *Foti*, the court found that the debt collector provided enough information to "entice" a return call by providing its name and re-turn telephone number and by referencing a matter that required immediate atten-tion. *See Foti*, 424 F.Supp.2d at 656. Solomon provided similar information to Cerrato. Its name and telephone number appeared on Cerrato's caller ID display, and by calling eight times within one month, it is hard to imagine how Cerrato could not realize that Solomon wanted her immediate attention. *See Stover v. Fing-erhut Direct Marketing, Inc.*, 2010 WL 1050426, at *4 (S.D.W.Va. Mar. 17, 2010) ("Unanswered telephone calls may com-municate to the recipient that someone is trying to speak with you, and, in the con-text of telephone calls from debt collec-tors, may communicate to a consumer that her lender wants to speak with her, and wants her to pay her debts.").

Furthermore, the *Foti* court was guided by its concern that a more narrow reading of the term "communication" ' would "cre-ate a significant loophole in the FDCPA, allowing debtors to circumvent ... provi-sions of the FDCPA that have a threshold 'communication' requirement." *Id.* at 657. Under Solomon's interpretation of the statute, debt collectors could call consum-ers however often they wish as long as the consumer does not pick up or the debt collector hangs up before reaching the con-sumer. "Such a reading is inconsistent with Congress's intent to protect consum-ers from 'serious and widespread' debt collection abuses." *Id.* Although Solomon argues that any such abuses would be prohibited under section 1692d of the FDCPA—which bars debt collectors from placing harassing telephone calls to debt-ors—this argument is unavailing for two reasons. First, such calls only violate sec-tion 1692d if the plaintiff can prove an intent to harass, oppress, or annoy. *See Derricotte v. Pressler & Pressler, LLP*, 2011 WL 2971540, at *5 (D.N.J. July 19, 2011).[10] Second, the fact that other provi-sions "might constrain a debt collector from making such persistent demands ... is not a basis for interpreting 'communica-tion' in a manner that would allow debt collectors to easily circumvent ... a provi-sion where there is a threshold 'communi-cation' requirement." *Foti*, 424 F.Supp.2d at 658 n. 25.

Furthermore, according to the Mer-riam–Webster dictionary, "communication" means: "an act or instance of transmitting; information transmitted or conveyed; a written or verbal message; a process by which information is exchanged between individuals through a common system of symbols, signs, or behavior." These defi-nitions do not require a two-way conversa-tion between parties. In fact, they only require that information is transmitted to another party. According to Merriam–Webster, to transmit means "to send or convey from one person or place to anoth-er," meaning a communication does not require any reciprocal response from the other party. Using this plain meaning of the term "communication," it is difficult to see how Solomon's eight unanswered tele-

---

**10.** Solomon argues in its papers that *Derri-cotte* holds that unanswered telephone calls do not constitute communications under the FDCPA. *See* Def.'s Mem. in Supp. Mot. for Summ. J. at 10. However, the *Derricotte* court did not have to reach that issue because it only had to determine whether the defen-dant violated section 1692d. *See Derricotte*, 2011 WL 2971540, at *3, *5. That section of the FDCPA does not require a "communica-tion" for there to be liability. 15 U.S.C. § 1692d.

phone calls, which displayed as such on the viewer ID of Cerrato and were seen by her, could not constitute "communications." The calls conveyed to Cerrato (1) who was calling because Solomon's name appeared on her caller ID display, and (2) why Solomon was calling—to collect her debts—because that was (a) the purpose of the myriad calls she received prior to her cease and desist letter, and (b) Solomon's role as a debt collector.

Using the *Foti* court's reasoning as a guide and taking the evidence in a light most favorable to Cerrato, the eight unanswered telephone calls—all of which displayed Solomon's name and telephone number—constitute "communications" under the FDCPA.

B. *Whether Solomon's telephone calls fit within an exception to 15 U.S.C. § 1692c*

■ Solomon also argues that, even if the court construes the eight unanswered telephone calls as "communications" under the FDCPA, it is not liable because it "could have communicated a myriad of specified remedies to Plaintiff" that would fall into an exception under section 1692c. Def.'s Mem. in Supp. Mot. for Summ. J. at 8. Once a debt collector receives a cease and desist letter, the debt collector should cease communications except: "(1) to advise the consumer that the debt collector's further efforts are being terminated; (2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or (3) where applicable, to notify the consumer that the debt collector intends to invoke a specified remedy." 15 U.S.C. § 1692c(c).

Solomon admits that it failed to note on account 79 that Cerrato sent a cease and desist letter. Pl. L.R. 56(a)(2) at ¶ 11. Once Ms. Esposito noticed that the ac-

count should have been listed as "ONTC," all calls stopped. *Id.* There is no evidence to support Solomon's claim that it was calling Cerrato for a legitimate purpose.

C. *Whether Solomon committed a bona fide error*

■ Finally, Solomon argues that, even if the eight unanswered telephone calls constitute "communications" under the FDCPA, it is absolved of liability because its communications with Cerrato were due to a bona fide error. "A debt collector may not be held liable in any action ... [for civil liability under the FDCPA] if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). To qualify for the bona fide error defense, Solomon must prove three things: (1) the presumed FDCPA violation was not intentional; (2) the presumed FDCPA violation resulted from a bona fide error (here, the assumed error in failing to mark all Citibank accounts as ONTC after receiving the February cease and desist letter); and (3) that it maintained procedures reasonably adapted to avoid any such error. *See Kort v. Diversified Collection Services*, 394 F.3d 530 (7th Cir.2005).

Without addressing whether Solomon intentionally violated the FDCPA, *see id.* at 537 ("A debt collector need only show that its FDCPA violation was unintentional, not that its actions were unintentional"), there are issues of material fact as to the second and third prongs. "The purpose of the second prong is to evaluate whether the debt collector's actions were objectively reasonable, and thus merit excuse from liability under the FDCPA." *Silver v. Law Offices of Howard Lee Schiff, P.C.*, 2010 WL 3000053, at *4 (D.Conn. July 28

2010). Although Solomon contends Ms. Collins mistakenly marked only account 58 as "ONTC," rather than placing the hold on all three of Cerrato's Citibank accounts, *see* Def.'s L.R. 56(a)(2) at ¶ 22–23, according to Cerrato, Ms. Collins purposefully marked "ONTC" only on account 58 because it was the only account listed, even though the February cease and desist letter referenced "all Citibank accounts." [11] *See* Pl. L.R. 56(a)(1) at ¶ 18. As such, it is a question of fact for the jury as to whether it was reasonable for Ms. Collins to place the ONTC hold on only one account even though the letter referenced "all accounts." *See Silver*, 2010 WL 3000053, at *4–5 (finding that reasonable jurors could disagree whether posting a check meant for Discover to the RAB account was reasonable when, on one hand, plaintiff failed to note a file number on her check, but on the other, included the word "Discover" on the check).

In addition, "[a]mong the factors pertinent to determining whether a debt collector's actions were reasonable is whether a collector has made such an error before." *Curto v. Palisades Collection, LLC*, 2011 WL 5196708 (W.D.N.Y. Oct. 31, 2011). After Cerrato sent a cease and desist letter regarding account 58 in September 2009, Solomon proceeded to call her six more times before ceasing communication. Def.'s L.R. 56(a)(2) at ¶ 10. Therefore, there are issues of material fact as to whether Solomon committed a bona fide error.

Further, there is a material issue of fact as to whether Solomon maintained procedures reasonably adapted to avoid Ms. Collins's error of only noting one account after receiving a cease and desist letter relevant to multiple accounts. "When attempting to show that he is entitled to the bona fide error defense, a debt collector 'need not demonstrate that his procedures for avoiding [FDCPA] violations are 'fool proof,' but rather, must only show that its procedures constitute a 'reasonable precaution.' '" *Dimovski v. Tolisano & Danforth, LLC*, 2011 WL 1638051, at *4 (D.Conn. Apr. 29, 2011) (citing *Katz v. Asset Acceptance, LLC*, 2006 WL 3483921 (E.D.N.Y. Nov. 29, 2006)). Solomon claims that it trains its employees in how to abide by the FDCPA and provides periodic testing and updates. Pl. 56(a)(2) at ¶ 12–14. However, Cerrato claims that such training is not "reasonably adapted" to prevent Solomon employees from calling consumers after a cease and desist letter is received. *See Reichert v. National Credit Systems, Inc.*, 531 F.3d 1002, 1006 (9th Cir.2008) (describing a two step process for determining whether the procedures are reasonable: first, whether the debt collector actually employed procedures to avoid errors and, second, whether the procedures were reasonably adapted to avoid the specific error at issue). According to Cerrato, the testing only pertains to whether a Solomon employee is allowed to contact a debtor one more time after receiving a cease and desist letter. Pl. 56(a)(1) at ¶ 17 (citing to Exhibit B, which sets forth "true" as the appropriate an-

---

**11.** At oral argument, Solomon claimed that there is no issue of material fact as to whether Ms. Collins made a mistake regarding placement of the "ONTC" notice on only account 58 because Ms. Collins testified that she misread the four-page cease and desist letter and mistakenly marked the "ONTC" notice on only one account because she did not notice that the last page, which referenced "all Citibank accounts," differed from the third page,

which only referenced account 58. *See* Pl. Mot. Summ. J., Ex. B, at 55. However, an issue of material fact remains because Ms. Collins mentions in other portions of her deposition that she saw that the first page of the cease and desist letter referred to "all Citibank accounts." *See id.* at 24, 52. Therefore, it is for a jury to decide whether it was reasonable for Ms. Collins to mark only account 58 as "ONTC."

swer"). The testing does not include questions about how to respond to cease and desist letters that may pertain to multiple accounts. Furthermore, Cerrato identifies evidence that Ms. Collins believed the appropriate practice, when receiving a cease and desist letter that applied to "all accounts," but only mentioned one account number specifically, was to place the ONTC code on the specifically numbered account only. Although, at oral argument, Solomon pointed to Ms. Collins' deposition testimony in which she stated that her supervisor trained her to place all files on notice when a letter references multiple accounts, but does not mention a specific account number, *see* Pl. Mot. Summ. J., Ex. B., at 17, a reasonable jury could find that Solomon did not have appropriate procedures in place to prevent the particular error at issue in this case, namely placing the "ONTC" notice on one account when a letter mentions both multiple accounts and a specific account number. *See Dimovski*, 2011 WL 1638051, at *5 (holding that whether the bona fide error defense applies is a question of fact for the jury). Therefore, summary judgment is denied.

## V. CONCLUSION

Because the court has determined that eight unanswered telephone calls can constitute "communications" under the FDCPA—at least calls in which the debt collector's name and telephone number appear on the consumer's caller ID display and follow over 100 calls previously placed by that debt collector—and that there are material issues of fact as to whether Solomon is entitled to a bona fide error defense, summary judgment is **DENIED** as to both parties on Cerrato's FDCPA claim. **SO ORDERED.**